## State v. Rowe
### [Cite as 5 AOA 245]

*Case No. 88AP-988*
*Franklin County, (10th)*
*Decided July 12, 1990*

*Michael Miller, Prosecuting Attorney, and Joyce S. Anderson, for Appellee.*

*John Frazier Jackson, for Appellant.*

BOWMAN, J.

On March 16, 1988, Jill Adams died after suffering four gunshot wounds to the head. Appellant, Rhonda G. Rowe, and her brother, Kevin Christopher Adams, were indicted by a grand jury on one count each of aggravated murder with the specification that the crime was committed with a firearm.

Appellant's brother, Kevin Adams, had been living with Jill Adams at an apartment located at 1738 East Long Street for approximately two years preceding her death. Kevin and Jill had been romantically involved since Jill s separation from her husband, Emanuel F. Adams, Jr., who is also Kevin and appellant's brother.

Kevin testified that he and Jill had been arguing because he sold drugs and did not work. Both Kevin and appellant admitted that appellant and Jill did not get along because of a previous incident which occurred between Jill and Emanuel Adams, Jr.

During the afternoon of March 16, 1988, Kevin and appellant had a conversation concerning Jill, but their testimony as to that conversation as well as most of the events that transpired after that conversation differed significantly. Kevin testified that he went to appellant's home that afternoon and brought up the subject of killing Jill, whereupon appellant said that if he would come by and pick her up, she would put a pillow over Jill's head and shoot her. Kevin then said he left appellant's home and went to pick up Jill from work around 5:00 p.m. There is no evidence as to what transpired until approximately 11:30 p.m., March 16,1988.

Kevin testified that, after an argument with Jill, she went to bed and he stayed up taking more drugs and drinking alcohol and thinking about killing Jill. Kevin then went into the bedroom, grabbed a loaded .25 caliber automatic pistol out of the closet, and shot Jill in the back of the head. Kevin testified that she was laying on her stomach when he shot her.

There existed a conflict over how many shots were fired by Kevin and which shot was fatal. Kevin testified he only fired one shot and that Jill immediately woke up and wondered what was going on, at which time he wrapped her in a blanket, carried her to the car and put her in the back seat.

Kevin testified that he next called appellant but did not get to talk to her. Kevin then drove to the apartment of appellant and her boyfriend, Charles Lane, to pick up appellant, when Kevin

told appellant what he had done and gave her the gun.

Kevin and appellant drove around for approximately one-half hour to forty-five minutes, ultimately stopping at the back of a bowling alley located on Harrisburg Pike. Kevin took·Jill out of the car and sat her up against the building.

Kevin testified that Jill asked him what was going on and he walked away. Kevin consistently testified that appellant then shot Jill in the head three times, but his testimony is conflicting as to his whereabouts at the time of each of the shots and whether there was a delay between the shots. In any event, Kevin testified that Jill fell over after the first shot, but was shot twice more by appellant.

Appellant offers a somewhat different version of events occurring on March 16, 1988. Appellant testified that Kevin called her around 2:30 or 3:00 p.m., on March 16, 1988, and told her he had to get rid of Jill. When asked where Jill was, appellant testified Kevin said she was sleeping. Appellant further testified that she did not enter into a plan to kill Jill, but told Kevin to "*** [j]ust let it alone *** " and that he could come stay at her house. (Tr. 449.) However, in her taped confession (State's Exhibit 1-C), appellant relates to Detective Rich that she initially agreed to help Kevin get rid of Jill during the first conversation in the early afternoon of March 16, 1988, but says later she also tried to talk him out of it.

Appellant testified that Kevin called her again around 11:30 or 12:00 a.m., telling her he "*** did it *** " and "*** needed help and *** was on his way over. *** " (Tr. 450.) Appellant told police that Kevin told her he shot Jill one time.

When Kevin arrived at her home, appellant agreed to leave with him. As she was getting in the car, appellant testified that she saw Jill in the backseat wrapped in a blanket and it did not look like she was moving. Appellant's testimony was that Jill Adams did not say anything during the ride or at the bowling alley. Upon arriving at the bowling alley, appellant testified that Kevin tried to sit Jill upright, but then laid her down flat.

Appellant said that Kevin told her to get the gun out of the glove compartment and fire a shot at Jill. Appellant states that she closed her eyes and fired once at the ground and a second time after Kevin told her to shoot again. However, appellant testified that Kevin told her to shoot one more time, but she refused. As she got back into the car, appellant said she put the gun under the seat.

Kevin and appellant then began driving and stopped at a gas station to fix a muffler. Kevin testified that he and appellant then went to his and Jill's apartment, where he gathered up the bloody sheets in a garbage bag and picked up Jill's minor son. The three of them went to appellant's home. The next day, Kevin and appellant's boyfriend, Charles Lane, went to buy cocaine and to pick up some personal belongings at Jill's apartment, and Kevin disposed of the garbage bag full of bloody sheets at that time.

William Bates, Jr., a Vietnam veteran, who lived approximately one mile from the bowling alley where Jill's body was found, testified that he "*** heard a bang, a pause and then two more bangs *** " (Tr. 167), around 11:30 or 11:45 p.m. the night of March 16, 1988. The police found three shell casings next to Jill's head. Jill Adams suffered four head wounds, two of which could have been fatal.

On April 5, 1988, Kevin Adams was arrested, interrogated and submitted to a polygraph examination, which he failed to pass. The fact of, and result of, Kevin Adams' polygraph test was admitted into evidence during appellant's trial. Although appellant properly objected after each occurrence, asking for a mistrial, the trial court overruled her motions.

On October 6, 1988, a jury found appellant guilty of murder with a specification that the offense was committed with a firearm. Appellant has appealed, raising the following assignments of error:

"1. THE TRIAL COURT ERRED IN PERMITTING THE USE OF DEFENDANT-APPELLANT'S CONFESSION AGAINST HER AT TRIAL, IN VIOLATION OF HER RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION TO HAVE COUNSEL PRESENT DURING CUSTODIAL INTERROGATION.

"2. THE TRIAL COURT ERRED IN PERMITTING THE DEFENDANT-APPELLANT'S CONFESSION TO BE INTRODUCED AT TRIAL SINCE THE TOTAL CIRCUMSTANCES SHOW THAT THE CONFESSION WAS NOT OBTAINED VOLUNTARILY BUT UNDER COERCION AND DURESS IN VIOLATION OF HER FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO THE UNITED STATES CONSTITUTION.

"3. THE TRIAL COURT ERRED IN PERMIT-
TING THE FACT OF AND RESULT OF A
POLYGRAPH TEST GIVEN TO CO-DEFEN-
DANT KEVIN ADAMS TO BE HEARD BY
THE JURY, THUS DEPRIVING DEFEN-
DANT-APPELLANT OF A FAIR AND
IMPARTIAL TRIAL IN VIOLATION OF DE-
FENDANT-APPELLANT'S FIFTH AND
FOURTEENTH AMENDMENT RIGHTS
UNDER THE UNITED STATES
CONSTITUTION.

"4. THE JURY'S EVENTUAL VERDICT WAS
AGAINST THE MANIFEST WEIGHT OF THE
EVIDENCE.

"5. THE TRIAL COURT ERRED IN NOT
REACTING CERTAIN PORTIONS OF THE
TRANSCRIPT OF STATE'S EXHIBIT NUM-
BER ONE BEFORE ALLOWING THE JURY
TO CONSIDER THAT EVIDENCE.

"6. THE TRIAL COURT ERRED IN GIVING
AN INSTRUCTION ON ACCOMPLICE."

Appellant's first two assignments of error raise the issue of whether appellant was afforded the constitutional protection governing the admissibility of her confession obtained as a result of the custodial police interrogation on April 5, 1988. Indispensable to the Fifth Amendment's privilege against self incrimination is the right to have counsel present at a custodial interrogation if requested. In *Miranda v. Arizona* (1966), 384 U.S. 436, the United States Supreme Court held that, as a constitutional prerequisite to the admissibility of statements obtained from an individual subject to custodial police interrogation, he must, prior to questioning, be informed that he has the right to have counsel present at the custodial interrogation. The court stated that an individual, having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities without the presence of counsel unless he validly waives his earlier request for counsel. *Edwards v. Arizona* (1981), 451 U.S. 477; *Oregon v. Bradshaw* (1983), 462 U.S. 1039. In *Miranda,* the court emphasized, at 475, that:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *** "

The threshold question in this case is whether appellant invoked her right to counsel in the first instance. In her first assignment of error, appellant argues that she asserted her desire for counsel and the law enforcement authorities were obligated to cease interrogation until counsel could be provided. Appellee, on the other hand, argues that appellant did not request counsel.

The interview involving the police officers and appellant began with appellant reading from the rights waiver form:

"ROWE: Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in a court. You have the right to talk to a lawyer for advice before we ask you any questions. And you have, and to have him present with you during questioning. If you are unable to pay a lawyer, a lawyer will be appointed for you prior to any questioning if you so desire. If you wish to answer questions now without a lawyer present you have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

"RICH: You understand that?

"ROWE: *Sort of.*" State's Exhibit 1C, at 1. (Emphasis added.)

Detective Rich continued further explaining the rights waiver form, specifically asking appellant if she wanted a lawyer at that time, whereupon she answered "yes."

"RICH: This portion down here is called a waiver. I have read and then read the statement of my rights shown above. That's what we just went over here.

"ROWE: Uh-huh.

"RICH: I understand what my rights are. Do you understand?

"ROWE: Yes.

"RICH: Okay. Finish reading now.

"ROWE: I do not want a lawyer at this time.

"RICH: Do you want a lawyer at this time?

"ROWE: *Yes.*

"RICH: Okay.

"ROWE: I am willing to answer questions.

"RICH: Are you?

"ROWE: It depends on what the questions are." State's Exhibit 1C, at 2. (Emphasis added.)

Instead of ceasing the interrogation or, at the very least, attempting to clarify appellant's affirmative answer to a request for a lawyer,

Detective Rich continued explaining the rights waiver form.

"RICH: Okay. Finish reading here and I'm going to tell you.

"ROWE: I understand and know what I am doing.

"RICH: Do you?

"ROWE: Yes. No promises or threats have been made to me and no pressure of any kind has been used against me." State's Exhibit 1C, at 2-3.

Although the trial court acknowledged that it was "*** black and white there on the transcript and it appears that she was requesting a lawyer, *** " he made a finding after listening to the tape that it "*** did not come across at all for a specific request for counsel, and I noted throughout the entire tape and the transcript she was very verbose, very cooperative *** ." (Tr. 44.)

If an accused "*** indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. *** " *Miranda, supra,* at 444-445. The court, in *Edwards, supra,* at 484, went on to hold that additional safeguards are necessary "** * when an accused has invoked his right to have counsel present during custodial interrogation *** " or "*** expressed his desire to deal with the police only through counsel ***

The court has acknowledged *Miranda's* "*** rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare v. Michael C.* (1979), 442 U.S. 707, at 719.

The United States Supreme Court addressed the issue of whether an accused's conduct or statements constituted an assertion of the right to counsel in *Smith v. Illinois* (1984), 469 U.S. 91. The court acknowledged that a statement either is or is not an assertion of the right to counsel. The court specifically stated, at 98, that "*** [w]here nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. *** " Subsequent statements made by the accused are relevant only to the question of whether the accused waived the previously invoked right. *Id.* at 98. The portion of the interrogation session on which *Smith* made its findings is strikingly similar to the police interrogation with appellant Rowe. The transcript of the conversation in *Smith* is as follows:

"Q. Steve, I want to talk with you in reference to the armed robbery that took place at McDonald's restaurant on the morning of the 19th. Are you familiar with this?

"A. Yeah. My cousin Greg was.

"Q. Okay. But before I do that I must advise you of your rights. Okay? You have a right to remain silent. You do not have to talk to me unless you want to do so. Do you understand that?

"A. Uh. She told me to get my lawyer. She said you guys would railroad me.

"Q. Do you understand that as I gave it to you, Steve?

"A. Yeah.

"Q. If you do want to talk to me I must advise you that whatever you say can and will be used against you in court. Do you understand that?

"A. Yeah.

"Q. You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?

"A. *Uh, yeah. I'd like to do that.*

"Q. Okay.' 102 Ill. 2d, at 368-369, 466 N.E. 2d at 238 (emphasis in opinion).'" *Smith, supra,* at 92-93.

The court, finding no ambiguity in Smith's initial request, stated that the interrogating officers should have terminated questioning at this point instead of continuing to read him his *Miranda* rights and pressing him to answer questions.

The Ohio Supreme Court, in *State v. Williams* (1983), 6 Ohio St. 3d 281, at 289-290, held that the conduct of the interrogating officers in the following conversation with the accused was unconstitutional:

"Q. ([Detective] McLaren): With these rights in mind do you want to talk to us at this time?

"A. [Williams]: Depending on what?

"Q. Did you understand what I just said?

"A. Yes.

"Q. Do you wish to talk to us at this time?

"A. I would like to have an attorney, you know. [Here the tape is unclear. Williams further stated either "if I can afford one" or "but I can't afford one."]

"Q. ([Detective] Simmons): Okay Tyrone, that is your privilege, of course. Your rights were explained to you by the patrolman also, weren't they?

"A. Yes, sir.

"Q. Okay, you understood the part where it said that you could start to talk to us and stop at any time you wanted to, didn't you?

"A. Yes.

"Q. Okay, you understood each and all of your rights?

"A. I surely did.

"Q. Okay, is it your choice then that you wish not to talk to us at this time or would you like to start to talk to us or

"A. I know I can say I didn't plan no robbery. I have no idea of it at all.

"Q. Well we have to *** , in other words we don't know what we are talking about really or what you are trying to tell us until we can hear your side of the story which we have heard from the other two guys side of the story but we don't know just exactly what your side is. We are completely in the dark sitting here like this. So if you wish to talk to us as your rights said you can and stop at any time or you can have an attorney. That's your prerogative."

Specifically, the court held that the appellant's request for counsel was never complied with, nor did he waive his right to counsel. *Id.* at 290. In both *Smith* and *Williams*, it was stated that the police officers, in continuing the interrogation, did more than merely clarify the accused's request for counsel, but continued to press for more answers.

The controversial portion of the interview with appellant is substantively similar to the interrogations in *Smith* and *Williams*. As Detective Rich was going over the rights waiver form with the appellant, he specifically asked her, "Do you want a lawyer at this time?" (Tr. 310.) Appellant unequivocally answered "Yes." Detective Rich said "Okay." Appellant then stated that she would be willing to answer questions. The detective asked "Are you?" and appellant answered, "It depends on what the questions are."

As in *Smith* and *Williams*, nothing about appellant's request for counsel, or the circumstances leading up to it, renders the request ambiguous. What could be more unequivocal than the word "yes" in response to a direct question. And, as stated in *Smith*, once the right to counsel has been asserted, an accused's subsequent statements are relevant only to the issue of waiver. The trial court could have only concluded Rowe's response to the detective's question of whether she wanted counsel as not being a specific request for an attorney is by considering her subsequent responses to the continued police interrogation and concluding as a whole bat she was very cooperative and was only acknowledging the language of the waiver. However, as stated in *Smith*, at 100:

"*** We hold only that, under the clear logical force of settled precedent, an accused's *post request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver."

Since appellant's response must be considered an assertion of her right to counsel, her responses to further questioning could be admitted at trial only if she initiated further discussions with the police and knowingly and intelligently waived the previously invoked right. *Edwards, supra*, at 485-486.

Assuming, *arguendo*, that appellant initiated further conversation with the police when she said she would be willing to answer questions, we cannot find she made a knowing and intelligent waiver of her earlier assertion of the right to counsel.

The court, in *Miranda, supra*, at 475, reiterated the strong presumption against waiver and the high standards of proof required to overcome this presumption. The court cited *Johnson v. Zerbst* (1938), 304 U.S. 458, at 464, which set forth the general standard for determining waiver:

"*** The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

The court, in *Oregon v. Bradshaw* (1983), 462 U.S. 1039, at 1044, made clear that:

"*** [E]ven if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. *** "

As the court, in *Arizona v. Roberson* (1988), 108 S.Ct. 2093, noted, the standards set forth in *Edwards* focus on the state of mind of the suspect and not of the police.

After appellant asserted her right to counsel, the detective continued explaining the rights waiver form, ignoring her assertion for counsel. At no time after this did the police officer attempt to clarify this affirmative request nor was Rowe reminded of her right to counsel after she allegedly initiated the discussion with Detective Rich. Although appellant signed the rights

waiver form, this fact is not in itself sufficient to establish waiver.

As in *Smith, supra,* the interrogating officer, in questioning appellant after she invoked her right to counsel, did more than merely try to clarify her request for counsel. It is evident from the transcript that appellant was confused and unsure of what to do:

"RICH: I will not make those kind of promises to you, Rhonda. You might sit here and tell me that you killed Jill Adams by yourself. Then where am I? You see what I'm saying dear?

"ROWE: *Not really.*

"RICH: If you sit here and tell me you killed Jill Adams, you took her out there and shot her, am I supposed to let you go home after you tell me that?

"ROWE: No.

"RICH: See I can't make those kind of promises to you. I don't know what you're going to tell me.

"ROWE: I don't know what to do. I don't want to go to jail. I got kids I got to get back and everything and I got three more weeks before I get my last son back." State's Exhibit 1C, at 3. (Emphasis added.)

The trial court noted that appellant was very verbose and cooperative throughout the interview, however, waiver cannot be inferred from the simple fact that she responded to interrogation. In addition, after succeeding in securing appellant's signature on the waiver form, the detective immediately recanted his earlier discussion with appellant's co-defendant implicating her in the crime. The detective also emphasized that they had only her co-defendant's side of the story and not hers. As the court stated in *Williams, supra,* at 290:

"*** The police officers' constant reminders to appellant, a young man facing murder and robbery charges, that they know his accomplices' side of the story but not his, can certainly be expected to engender incriminating statements, particularly when appellant is aware that his accomplices have already implicated him. It is hardly surprising then that, under such circumstances, an accused, feeling himself evidentially outnumbered, will admit to some degree of complicity in the criminal offense. This is exactly what happened."

The state has not met its burden to prove that the appellant validly waived her right to counsel.

Even though we determine appellant's initial confession was obtained and admitted at trial in violation of her Fifth Amendment right to counsel, such error was not prejudicial in this instance. The Ohio Supreme Court, in *Williams, supra,* at 290, has adopted the *Harrington* test:

"*** Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt. *Harrington v. California* (1969), 395 U.S. 250, 254. *** "

As in *Williams,* admission of the taped confession, although improper, was harmless beyond a reasonable doubt since appellant's testimony at trial concerning the shooting was substantively the same as that in the confession. It is clear that appellant's side of the story was simply not believed. Therefore, although admitting the taped confession at trial was improper, we find the error was harmless beyond a reasonable doubt. Thus, appellant's first assignment of error must be overruled.

In her second assignment of error, appellant alleges her taped confession was not obtained voluntarily, but under coercion and duress in violation of her Fifth and Fourteenth Amendment privileges against self-incrimination. Appellant specifically argues that her confession was involuntary because the action of the police officers in allowing her parents to question appellant was coercive, as her parents were acting as interrogators and agents of the police. However, appellant's discussion with her parents did not elicit anything incriminating that her discussion with Detective Rich had not already produced. Appellant reiterated the fact that she thought Jill was dead because she did not move or speak and that she only fired twice at the ground. There is no evidence tending to show that the police officers in any way encouraged appellant's parents to lead the conversation in a particular manner to obtain incriminating information. Appellant's parents were not acting on behalf of the police, but in their own interests.

In order to protect the privilege against self-incrimination at an accused's trial, "*** the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *** " *Miranda, supra,* at 444. The court, in *Miranda,* at 467, concluded that:

"*** [W]ithout proper safeguards the process of in-custody interrogation of persons suspected

or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. *** ."

The court, in *Miranda,* was concerned about the coerciveness of the "interrogation environment." *Id.* at 457.

With regard to the issue of voluntariness of a confession, the court must use the totality of the circumstances test in determining whether the police improperly induced incriminating statements through coercion. *Haynes v. Washington* (1963), 373 U.S. 503; *State v. Edwards* (1976), 49 Ohio St. 2d 31.

The United States Supreme Court explained that "*** the term 'interrogation' under *Miranda* refers to not only express questioning, but also any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *** " *Rhode Island v. Innis* (1980), 446 U.S. 291, at 301.

The appellee correctly noted that, in order to find that a confession was not voluntary, there must have been coercive police activity. *Colorado v. Connelly* (1986), 107 S.Ct. 515. However, allowing an accused to consult with family members during a custody situation is not in and of itself the type of compulsion with which *Miranda* and its progeny are concerned. The United States Supreme Court held, in *Arizona v. Mauro* (1987), 107 S.Ct. 1931, at 1935, that the officer's decision to allow the accused's wife to see him was not "*** the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation." Nor did the court think that the "*** suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way." *Id.* at 1936.

Absent a showing of "police trickery or overbearing" conduct by *a* police, allowing the accused to talk with a relative does not violate an accused's Fifth and Fourteenth Amendment rights. *People v. Whitehead* (Ill. 1987), 508 N.E. 2d 687; *State v. McBroom* (June 25, 1985), Franklin App. No. 84AP-1163, unreported (1985 Opinions 1846).

The trial court could not find any "improprieties on the part of the police to justify suppression of the statements" (Tr. 45.) This finding is supported by the evidence. The police officers did not incite or coach the appellant's parents to illicit a confession. In fact, it has been stated that "*** [t]he refusal to let relatives visit a suspect in custody was one of the police practices that the *Miranda* court identified as vitiating the fifth amendment privilege *** ." *Whitehead, supra,* at 692. The officers merely allowed appellant's parents to talk with her after the police had finished their interrogation. Although appellant, at one point, said she did not want to talk anymore, it was her mother who continued to illicit further information from her. Appellant then continued answering her mother's questions. Under the circumstances, there was no reason for the police to discontinue the conversation. The police did not make any threats, nor were they physically or mentally abusive. As the United States Supreme Court, in *Connelly, supra,* at 520, noted:

"*** Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. *** "

Since the police officers' actions were not coercive and appellant's parents were not acting as their agents, appellant's second assignment of error is overruled.

In her third assignment of error, appellant argues that it was prejudicial error to allow the prosecution to use the fact of and results of her co-defendant's polygraph examination at trial.

The results of polygraph tests are generally not admissible as evidence for purposes of establishing the guilt or innocence of the accused for the reason that such tests have not attained scientific or judicial acceptance as an accurate and reliable means of ascertaining truth or deception. Annotation (1952), 23 A.L.R. 2d 1306; 29 American Jurisprudence 2d (1967) 923, Evidence, Section 831. However, in Ohio, polygraph results of a defendant may be admissible for purposes of corroboration or impeachment providing the following conditions are met:

"(1) That the county attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

"(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i.e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

"(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

"a. the examiner's qualifications and training;

"b. the conditions under which the test was administered;

"c. the limitations of and possibilities for error in the technique of polygraphic interrogation; and

"d. at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

"(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given." *Valdez,* at pages 283-284." *State v. Souel* (1978), 53 Ohio St. 2d 123, at 132.

The court, in *Souel,* adopted these standards which were announced in *State v. Valdez* (1962), 91 Ariz. 274, 371 P. 2d 894. This strict standard has not been abandoned or relaxed in Ohio. *State v. Whitmeyer* (1984), 20 Ohio App. 3d 279; *State v. Williams* (1983), 4 Ohio St. 3d 53; *State v. Levert* (1979), 53 Ohio St. 2d 213. This court specifically stated that "*** in Ohio, the results of a defendant's polygraph test are admissible only by agreement and only if all of the requirements of *Souel, supra,* are strictly complied with." *State v. Lascola* (Dec. 20, 1988), Franklin App. No. 88AP-407, unreported (1988 Opinions 4529), at 4534.

Furthermore, Ohio has recently taken note of the fact that "*** courts are again questioning the reliability of the polygraph, and are beginning to prohibit its use even with the *Valdez* stipulation. *** " *State v. Gordon* (Mar. 31, 1989), Geauga App. No. 1410, unreported, at 17. Although *Souel* dealt with the admission of a defendant's polygraph results, as opposed to those of a state's witness, this court has held that "*** at a minimum, the same requirements that apply to a defendant's polygraph testing procedure should also apply to the admissibility of *any* polygraph test results in a criminal matter. ***" *Lascola, supra,* at 4538. This court went on to hold, at 4538:

"*** These requirements are minimum safeguards established to ensure the fairness of the proceedings. Therefore, we agree with defendant that if polygraph test results of a witness can ever be admitted, the requirements of *Souel* must be met."

Here, there was no stipulation of any kind and the trial judge did not give any specific jury instructions with regard to the admission of the polygraph testimony. The only attempt at a jury instruction after allowing the introduction of the exam as evidence was the following:

"THE COURT: *** We are discussing items of evidence that I have to rule on as to whether they're admissible or not as indicated. When I rule not admissible, you're supposed to completely forget about it *** ." (Tr. 112.)

Ohio courts have stressed the critical importance of instructing the jury regarding polygraph tests once brought out in trial. *State v. Hegel* (1964), 9 Ohio App. 2d 12; *Lascola, supra.* For example, in *Lascola, supra,* at 4531, the court admonished the fact that "*** the instructions to the jury did not include a special charge regarding how the jury should consider the results of the polygraph test." Therefore, it is clear that it was error for the state's witness' polygraph test and results thereof to have been admitted at trial.

The issue then becomes whether the admission of the polygraph results constituted prejudicial error. The mere mention that a witness or defendant had taken a lie detector test has been held to be prejudicial error. *State v. Smith* (1960), 113 Ohio App. 461; *People v. York* (1975), 29 Ill. App. 3d 113, 329 N.E. 2d 845; *State v. Harris* (Oct. 3, 1984), Hamilton App. No. C-830927, unreported.

In determining whether a defendant was prejudiced by the admission of testimony regarding a polygraph test, "[t]he effect of inadmissible testimony upon the final outcome of any case cannot, of course, be gauged with mathematical certainty, but the manifest weight of the type of testimony erroneously admitted in the present case cannot conscientiously be ignored ***." *Hegel, supra,* at 14.

As recently stated by this court in *Lascola, supra,* at 4537:

"*** There is no way for this court to determine precisely the total impact of the polygraph test results upon the jury. *** "

The court went on to state, at 4537, that:

"*** There is at least a reasonable probability that without the results of the polygraph tests

the outcome of the trial would have been different."

The court, in *People v. Rocha* (Mich. App. 1981), 110 Mich. App. 1, 312 N.W. 2d 657, at 661, set forth the following factors to determine whether a reversal is warranted:

"*** (1) [W]hether defendant objected and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; and (5) whether the results of the test were admitted rather than merely the, fact that a test had been conducted."

In the instant case, there were repeated references to the test results, with appellant objecting to each, moving for a mistrial. The trial court admitted the results without giving the jury a cautionary instruction. The only reasonable explanation behind the prosecution's purpose in bringing up the fact that the co-defendant failed the polygraph test was to bolster the credibility of his testimony at trial. This is supported by the prosecution's direct examination of appellant's co-defendant.

After co-defendant, Kevin Rowe, testified that he failed the polygraph test, he admitted to the lies that he had initially told. The prosecution then tried to show that the witness, having admittedly lied before when he failed the polygraph, now must be telling the truth at trial with a different, and truthful, account of what happened. Since there were no other witnesses to the crime and the medical evidence was inconclusive as to which shot or shots caused Jill's death, the jury's verdict of guilty necessarily implies that they found Kevin Adams more credible than the appellant.

Where credibility is a critical issue at trial, the court cannot ignore the possible effect references to polygraph results may have on the jury's decision. As stated in *Harris, supra,* at 6:

"*** The jury essentially had to choose to believe either the victim or appellant as to whether or not appellant committed the crimes charged. The evidence implying the results of the polygraph test may have improperly bolstered the credibility of the victim's testimony in the minds of the jurors. It is possible that the polygraph test was the deciding factor in the minds of some jurors. Under these circumstances, we find that the introduction of the evidence concerning the victim's polygraph test was highly prejudicial to the rights of appellant and that no curative in-

struction could remove the harm that may have been done. *** "

As mentioned before, this court recently held that:

"By allowing the polygraph results to be admitted without a proper foundation and by not giving a limiting instruction to ensure that such results would not be given too much weight, the trial court committed plain error. *** " *Lascola, supra,* at 4541.

Therefore, appellant's third assignment of error alleging the trial court committed prejudicial error in refusing to grant a mistrial subsequent to the introduction of the results of the co-defendant's polygraph test must be sustained.

In her fourth assignment of error, appellant argues that her conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.

In determining the sufficiency of the evidence, the test is whether reasonable minds can reach different conclusions on the issue of whether the defendant is guilty beyond a reasonable doubt. *State v. Black* (1978), 54 Ohio St. 2d 304. In viewing the evidence in a light most favorable to the prosecution, the reviewing court must determine whether a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *State v. Martin* (1983), 20 Ohio App. 3d 172.

Generally, a reviewing court will not overturn a jury verdict when there is substantial evidence going to all the essential elements of the crime and the trier of fact could reasonably conclude that the state has proved the offense beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St. 2d 169.

In reviewing the legal sufficiency of the evidence to support a verdict by the trier of fact, it is the minds of the jurors rather than the reviewing court that must be convinced. *State v. Thomas* (1982), 70 Ohio St. 2d 79. Applying these standards of review, the issues of credibility of witnesses and the weight to be accorded certain evidence are matters left primarily to the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The test for determining whether appellant's conviction is against the manifest weight of the evidence is somewhat broader.

"*** The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created

such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *** " *Martin, supra*, at 175.

In the first instance, Kevin Rowe's testimony, if believed by the jury, in addition to the physical evidence, were legally sufficient to allow the jury to reach the conclusion that Rhonda Rowe was guilty of murder. While appellant correctly notes that Kevin Rowe's testimony contained several inconsistencies, so also did her testimony. Conflicting testimony is not grounds for reversal. *State v. Mathis* (1984), 16 Ohio App. 3d 13. The jury's decision to believe Kevin Rowe that appellant fired three shots at the crime scene is also supported by a witness testifying he heard three consecutive shots fired that night.

Furthermore, the expert testimony regarding which shot or shots were actually fatal was inconclusive and it was within the jury's discretion to weigh this evidence. The evidence indicates two of the four shots could have been fatal. Appellant could very well have fired the fatal shot. Accordingly, appellant's fourth assignment of error is overruled.

Appellant's fifth assignment of error alleges the trial court's refusal to exclude certain portions of a transcript of her confession was prejudicial to appellant, depriving her of a fair and impartial trial as guaranteed by the Fifth Amendment of the United States Constitution. However, appellant's brief and argument are unclear as to what specific portions of the transcript she believes is prejudicial.

Appellant relies on Evid. R. 403, prohibiting the admissibility of evidence if its probative value is outweighed by its prejudicial effect. However, it is well-established that the admission of relevant, potentially prejudicial evidence lies within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St. 3d 173. Therefore, a trial court may be reversed only by a showing of an abuse of that discretion. *State v. Williams* (1982), 7 Ohio App. 3d 160. Appellant has not shown that she suffered any material prejudice by the trial court's refusal to remove parts of appellant's statements in State's Exhibit 1A. Therefore, appellant's fifth assignment of error is overruled.

In appellant's sixth assignment of error, she asserts that the trial court erred in its instruction on accomplice. However, the court finds that the trial court's jury instruction regarding the testimony of an accomplice was substantially in compliance with that required by R.C. 2923.01, and the sixth assignment of error is overruled.

For the foregoing reasons, appellant's first, second, fourth, fifth and sixth assignments of error are overruled, and appellant's third assignment of error is sustained. The judgment of the trial court is reversed and this cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed and*
*cause remanded.*

AMMER, J., concurs.

WHITESIDE, J., concurs in part.

AMMER, J., of the Pickaway County Court of Common Pleas, sitting by assignment in the Tenth Appellate District.

WHITESIDE, J., concurring in part.

Being unable to concur with the conclusion that the violation of defendant's constitutional right to counsel was harmless error, I would sustain rather than overrule the first assignment of error. Otherwise I concur in the majority opinion and judgment.