OPINION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Sandusky County Court of Common Pleas. Appellant, Powell Greene, appeals his conviction on the charge of felonious assault, a violation of R.C. 2903.11(B), with a firearms specification.
The undisputed facts of this case are as follows. During the early morning hours of November 16, 1996, Rodney A. Lewis drove to Fremont, Sandusky County, Ohio, in order to purchase some crack cocaine. He was approached by Anthony Hoffman, the victim in this case, who offered to get him some "stuff." Hoffman got into the automobile and Lewis drove him to Tiffin Street. Lewis gave Hoffman $50, and Hoffman got out of the car. Hoffman began speaking with a group of African-Americans. Lewis heard a sound like a firecracker; shortly thereafter, he heard a bullet hit the automobile. Lewis then sped away from the scene.
A police officer, as well as residents of Tiffin Street called in reports of the sound of gunshots. When a patrolman arrived on the scene, he found Anthony Hoffman lying in a pool of blood. Hoffman was dead as the result of a gunshot wound to the top of his head. The victim also had a gash, caused by his skull splitting as a bullet traveled through his brain, on his forehead, deep parallel lacerations above his left eye and a gunshot wound to his left leg. As to the leg wound, the entrance point of the bullet was the front of the left thigh, and the exit wound was the back of the left thigh near the back of the knee. A fired cartridge retrieved from the victim's head wound revealed that the bullet used was .45 caliber Remington Peters. James Patrick, M.D., the Lucas County Coroner, testified that the parallel lacerations were inflicted shortly before the victim's death and could have been caused by the ridged barrel of certain types of large semi-automatic handguns.
Larry A. Rentz, a forensic scientist employed by the Ohio Bureau of Criminal Identification and Investigation, testified that there are a "large number" of semi-automatic handguns have grooves on the barrel and are used to grip the "slide" on the gun and pull it back in order to actuate the weapon.
The testimony at appellant's jury trial as to whether Powell Greene was the person who shot Anthony Hoffman was conflicting. Lori L. Zamora, a resident of Tiffin Street, said she looked out her bedroom window when she heard someone arguing. She stated that she saw Powell Greene shoot at Anthony Hoffman as he limped away down the street; however, from her testimony it was impossible to determine whether Greene was responsible for the fatal gunshot wound and/or the wound to the victim's leg and the abrasions above his left eye. She also stated that Greene was wearing jeans and a black leather jacket. Furnell Osbin provided the following version of the events occurring on November 15 and November 16, 1996. Osbin, Earl Jackson, Greene, Keith Nettles and Jackson's girlfriend left a bar in downtown Fremont and went to 315 Tiffin Street, the residence shared by Stanley Graham, his girlfriend and his girlfriend's three children. The group was planning to attend an after hours party at the "PlayStation." Stanley Graham answered the door at 315 Tiffin Street; his girlfriend was not home. While Osbin and the others were watching television in the family room, some other people arrived. Stanley Graham brought some guns "wrapped in a towel" from the upstairs and gave one each to Nettles and Greene. One gun was a "45" and the other, a nine millimeter. Osbin was not sure as to which individual had a particular type of gun.
Someone else then knocked on the door. When Nettles and Greene opened the door, Osbin saw Anthony Hoffman. Hoffman held up a $100 bill, and Osbin heard either Nettles or Greene say "This is not a crack house." Someone took Hoffman's money. At that point everyone went outside to leave for the party. Earl Jackson and Powell Greene walked with Tony Hoffman toward the Lewis automobile. They wanted to see who brought Hoffman to Tiffin Street. The trio turned and took a few steps back toward 315 Tiffin Street. At that point, Powell Greene struck Tony Hoffman on the left side of his forehead with the gun. The gun went off (presumably on the down swing) and wounded Hoffman in the leg. Hoffman fell to his knees shouting, "Why did you shoot me? You shot me!" Greene and Jackson walked back to their friends. Sometime during this sequence of events, Earl Jackson shouted at Lewis to get out of there and then shot at Lewis' car.
Subsequently, Osbin, Greene, Jackson and Nettles had a discussion about "keeping quiet." Greene handed Nettles the gun; Nettles put the gun up to Osbin's face and told him not to say anything. At that point, Powell Greene said, "He knows my name." Nettles gave the gun back to Greene and told everyone to go back inside the house. As Osbin was walking into the house, he heard a shot and the sound of police sirens. Jackson, Greene and Nettles were still outside the house at this time. When Greene came back into the house, he immediately changed his clothes.
Alex McCallister testified that he and Rick Greider and Rick's girlfriend went to Tiffin Street during the early morning hours of November 16, 1996 to buy some crack. Greider got out of the car to make the purchase. McCallister, who was in the back seat of the automobile, heard a "pop." When he turned and looked down the street, he saw Hoffman attempting to run, but, instead, he fell down. According to McCallister, Powell Greene then shot Hoffman in the head, and passed the gun to someone else. McCallister claimed that he was a friend of Hoffman's when they were in high school and that he knew Greene "when he saw him."
Stanley Graham testified that a group of people, including Greene, Nettles, Osbin and Jackson, came to his home during the early morning hours of November 16, 1996. He stated that Nettles and another man (Curtis) went to the "linen closet" and brought out a gym bag with guns in it. Nettles and Jackson each took a "big" automatic gun and Greene gave Curtis a smaller gun. Graham went upstairs and carried down ammunition for the guns wrapped in a towel. Greene loaded the clips with ammunition. Graham then went to check on his girlfriend's children who were sleeping in an upstairs bedroom. When he came back downstairs, Nettles, Greene and Jackson were in the front room. Graham went toward the back of the house toward the bathroom. While he was there, he thought that he heard someone knock at the door, but when he came back to the front room, everyone had gone outside.
Graham laid down for about ten or fifteen minutes. He got up when he heard a shot. Within seconds, he then heard two more shots in quick succession. By the time he heard the second and third shots, Greene was coming in the front door. Graham asked Greene, "What's going on?" Greene answered, "They're out there shooting." Graham looked out the door and saw Jackson with a gun. He also saw Nettles holding a gun to Osbin's head. Because he thought that Nettles was going to shoot Osbin, Graham shouted "Police!" Everyone scattered. Greene came into the house and put a light brown sweater on over his "Fila" jeans outfit. Graham never saw Greene with a .45 caliber or other large handgun in his possession.
As a result of Hoffman's shooting and death, Greene was charged with one count of aggravated murder, a violation of R.C.2903.01(A), with a firearm specification and one count of felonious assault, a violation of R.C. 2903.11(B), with a firearm specification. He and Earl Jackson, who was convicted of having a weapon while under disability, were tried together. Graham, who was charged with, among other things, complicity to murder, entered into a written plea agreement with the Sandusky County Prosecutor. Under the terms of the agreement, Graham was required to provide all information concerning the death of Hoffman and, if requested, pass a polygraph test concerning this information. In addition, Graham agreed to testify at the trial of Greene and/or Jackson "truthfully and consistently with the information provided."
Prior to Graham's testimony, Alfred J. Cooper, Jackson's attorney, made an oral motion in limine asking the court to exclude the mention of the fact that Graham took a polygraph test. Geoffrey L. Oglesby, Greene's attorney, joined in that motion. The court ruled that if the issue of the plea agreement was raised during cross-examination of Graham, it was only fair that the entire plea agreement, including the mention of a polygraph examination requirement was admitted. Cooper then indicated that he would not discuss the plea bargain during his cross-examination. Oglesby, however, believed it was necessary to discuss the plea bargain in order to reveal that Graham was charged with the offense of "complicity to commit murder."
The prosecution's sole question regarding this matter on direct examination was whether Graham had entered into a plea agreement. During his cross-examination of Graham, Cooper brought out the fact that Graham entered into a plea agreement on the morning that the trial commenced. Oglesby, in his cross-examination, asked Graham whether taking a polygraph test was part of his agreement. Graham replied in the affirmative. Oglesby then queried: "Did you take it?" Graham answered, "Right." Oglesby asked, "Did you get your deal?" and Graham once again replied, "Right." Exhibit 39, the plea agreement, was entered into evidence without objection.
The jury returned a verdict finding Greene "Not Guilty" on the charge of aggravated murder and the lesser included offense of murder. As stated previously, he was found guilty on the offense of felonious assault with a firearm specification and sentenced to a total of ten years in prison.
Appellant appeals his conviction and sets forth the following assignments of error:
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY OVERRULING A MOTION IN LIMINE [sic] TO EXCLUDE FROM EVIDENCE A PLEA AGREEMENT WHICH STATED THAT A PROSECUTION WITNESS TOOK AND PASSED A POLYGRAPH EXAMINATION."
 "THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."
 "THE TRIAL COURT COMMITTED PLAIN ERROR BY ADMITTING INTO EVIDENCE POLYGRAPH TEST RESULTS AND BY FAILING TO GIVE A LIMITING JURY INSTRUCTION CONCERNING POLYGRAPH EVIDENCE."
 "THE VERDICT OF GUILTY TO THE OFFENSE OF FELONIOUS ASSAULT AND FIREARMS SPECIFICATION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
Appellant's first and third assignments of error are interrelated and shall be considered together. In his first assignment of error, appellant contends the trial court erred in overruling trial counsel's motion in limine asking the court to preclude mention of the polygraph results from evidence. In his third assignment of error, appellant asserts that admission of the plea agreement into evidence was plain error.
A ruling on a motion in limine is "a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of [an] evidentiary issue." State v.Grubb (1986), 28 Ohio St.3d 199, 201-202. Failure to object to the disputed evidence at the trial constitutes a waiver of any challenge, regardless of the disposition made for a preliminary motion in limine." Id. at 203, quoting State v. Wilson (1982),8 Ohio App.3d 216, 220. Moreover, under the invited error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make. State ex rel. v. Cos. v. Marshall (1998), 81 Ohio St.3d 467,471. Accord State v. Wilson (1996), 74 Ohio St.3d 381, 396. In the case before us, appellant's attorney failed to object to the admission of the polygraph results/plea bargain at the appropriate times during trial; therefore, he waived the right to raise their admission on appeal. In addition, the plea bargain itself does not reveal that appellant did submit to a polygraph examination. It was appellant's attorney who actually elicited the testimony concerning the "results" of the polygraph in his cross-examination of Stanley Graham. Thus, this alleged error could be considered waived and/or invited error.
Appellant argues, however, that the admission of the polygraph results of a prosecution witness are so prejudicial to a defendant that they must be excluded from evidence. Apparently, the Ohio Supreme Court disagrees with this argument.
In State v. Spirko (1991), 59 Ohio St.3d 1, at 6-7, the Ohio Supreme Court considered a similar factual situation where the trial court admitted the fact that a prosecution witness passed a polygraph examination into evidence. The court held:
 "In reviewing the alleged errors involved in [the prosecution witness'] testimony, several aspects are readily apparent. First, no objection was made by the defense when the allegedly prejudicial statements concerning polygraphs occurred. Second, the statement that [the prosecution witness] had passed a polygraph examination was elicited by defense counsel, not the prosecution, and no curative instruction was requested by defendant at that time. In such situations, the defense cannot invite error and later complain about its prejudicial effect on appeal. See, generally, State v. Woodruff (1983), 10 Ohio App.3d 326, 10 OBR 532, 462 N.E.2d 457; 5 Ohio Jurisprudence 3d (1978) 97, Appellate Review, Section 543 et seq. Third, the standards of Souel, supra, were not implicated here since no polygraph examination results were admitted during the trial." Id, at 7-8.
Thus, it appears that the Ohio Supreme Court is of the opinion that error in the admission of evidence, other than actual test results, related to a polygraph examination can be waived and/or invited.
Notwithstanding the decision of the Ohio Supreme Court, appellant points to appellate cases that have taken an opposite view. We shall, therefore, discuss the law as developed in these cases.
Generally, the results of a defendant's polygraph test are not admissible to prove the guilt or innocence of an accused because the polygraph has not been recognized by the scientific community as being an accurate, reliable method for determining veracity. State v. Rowe (1990), 68 Ohio App.3d 595, 609. Polygraph results may be admissible for the purpose of corroboration or impeachment where the stringent standards set forth in State v. Souel (1978), 53 Ohio St.2d 123, syllabi, are met. Id. at 609-610. The pertinent conditions are: "(1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state;" (2) the examiner must present the polygraph results, be qualified and cross-examined (3) the court must provide the jury with a limiting instruction. Id., State v. Rapp (1990),67 Ohio App.3d 33, 39-40. It is undisputed that these requirements for the admission of polygraph test results were not met in this case. As a result, appellant relies on the plain error doctrine.
Where a substantial right of the defendant is affected through obvious and prejudicial evidence that serves to undermine confidence in a jury verdict, a reviewing court may find plain error under Crim.R. 52(B) and reverse. State v. Slagle (1992),65 Ohio St.3d 597, 604. Thus, an alleged error "does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus.
The trial court found that Souel was applicable only to the polygraph results of a defendant. The Franklin County Court of Appeals has, nonetheless, determined that the strictures provided in Souel are equally applicable in the admission of the results of or any reference to a polygraph administered to any witness in a criminal trial. State v. Harris (1991), 73 Ohio App.3d 57,64; State v. Rowe, 68 Ohio App.3d at 610; State v.Lascola (1988), 61 Ohio App.3d 228. In Rapp, the Ross County Court of Appeals reached the same conclusion. While we agree with these holdings because of the impact that polygraph results, however unreliable, have on a jury in assessing the credibility of a witness or a defendant, we must find that, under the facts of this case, the admission of the fact that Graham passed a polygraph examination does not rise to the level of plain error under Crim.R. 52(B).
A review of the record reveals that Graham's testimony did not benefit the prosecution's case against Greene. Graham never saw Greene with either a .45 caliber or nine millimeter gun in his hand and did not witness Greene either striking Hoffman or shooting a firearm. Further, his description of the sequence of the gunshots he heard and the fact that Hoffman's body was found further down the street from 315 Tiffin, when combined with his testimony that Greene came into the house as the shots were heard, virtually eliminate appellant as the person who shot Anthony Hoffman. Thus, the fact that Graham passed a polygraph examination actually supported the claim that appellant did not assault or shoot Hoffman and was not prejudicial to his case. Moreover, Graham's testimony was insignificant for the purpose of proving the felonious assault charge. Absent all of Graham's testimony, the outcome of the trial would not have been otherwise on this charge. As discussed below, the eyewitness testimony of Osbin, the coroner and Lentz, as well as the physical evidence offered, was sufficient to sustain the jury verdict of guilty of the offense of felonious assault with a firearm specification. Accordingly, we find appellant's first and third assignments of error not well-taken.
In his second assignment of error, appellant claims that he was denied effective assistance of counsel in violation of theSixth Amendment, United States Constitution, and Section 10, Article I, Ohio Constitution.
In order for a criminal defendant to prevail on a claim of ineffective assistance of counsel, it must be demonstrated that (1) counsel's performance fell below an objective standard of reasonable representation and that (2) prejudice resulted to the defendant from the performance of counsel. Strickland v.Washington (1984), 466 U.S. 668, 687. To show that he was prejudiced, appellant must establish that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Id.; State v.Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus.
Appellant first alleges that trial counsel's performance was deficient because he questioned a prosecution witness about a polygraph and failed to object to the admission of test results that bolstered the witness's credibility. In addition, he argues that trial counsel's failure to request a limiting jury instruction concerning the polygraph examination violated counsel's duty to his client. Assuming, arguendo, that trial counsel's performance was deficient in these respects, this performance did not prejudice appellant's defense. As discussed previously, the fact that Graham "passed" a polygraph examination was not prejudicial to appellant's defense. Therefore, his claim of ineffective assistance of counsel in this regard must fail.
Appellant further contends that his trial counsel's performance was deficient because he failed to object to the testimony of Alex McCallister "concerning alleged threats made against him because of his testimony." Appellant asserts this testimony was irrelevant and highly prejudicial.
During his direct examination of McCallister, the prosecutor asked why he had not come forward with his evidence in a more timely manner. McCallister replied that he was not a "humanitarian" and did not want to get involved. He said, however, that after the November 16, 1996 murder of Tony Hoffman, Greene and his "boys" tried to gang up on him twice. He then thought "* * * it's going to happen again and I may be the one to get `capped.' I may still get `capped.' That's all right." According to McCallister, that was the point at which he decided to speak to a police detective. The prosecutor then asked whether McCallister thought "they" might try to do something to him because of his testimony. McCallister answered:
 "That's just how dirty they are. If they wouldn't have tried to click up on me I probably wouldn't have never said, and I probably would have held it to me until I left."
The failure to object to evidence, alone, is not enough to sustain a claim of ineffective assistance of counsel. SeeState v. Holloway (1988), 38 Ohio St.3d 239, 244. We agree with appellant that the testimony was inadmissible because it had little relevance to the proof of the charged offenses. See Evid.R. 401. But we disagree that it was prejudicial in the sense that a different outcome probably would have obtained at trial had counsel objected to it.
McCallister alleged that he saw Greene shoot Hoffman in the head. He had no knowledge as to the alleged felonious assault, that is, the blow to the head. Thus, McCallister's testimony went to the proof of aggravated murder/murder and was obviously disregarded by the jury. Even without the testimony of McCallister, the state presented ample, probative evidence from which the jury could have reasonably concluded that Greene knowingly caused or attempted to cause physical harm to Anthony Hoffman with a deadly weapon or dangerous ordnance. In particular, Osbin's testimony, if considered credible by the jury, was sufficient to prove the state's case.
Based on the foregoing reasons, and in view of the other evidence of guilt presented at trial, we are not persuaded that counsel's failure to object to the testimony of McCallister amounted to ineffective assistance, or that the admission of the testimony was plain error. Therefore, appellant's second assignment of error is found not well-taken.
In his fourth assignment of error, Greene maintains that the jury verdict on the charge of felonious assault with a firearm specification was against the manifest weight of the evidence.
Weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. The Ohio Supreme Court has defined the standard applied to determine whether a criminal conviction is against the manifest weight of the evidence:
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 388, citing Tibbs v. Florida (1982), 457 U.S. 31, 42.
To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. Only if we conclude that the jury clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial. Id.
Appellant was convicted of a violation of R.C.2903.11(A)(2) with a specification that he had a firearm in his possession or under his control and used it to facilitate the offense, see R.C. 2941.145. R.C. 2903.11(A)(2) provides that no person shall knowingly cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance as defined in R.C. 2923.11.
Upon a review of all the evidence in this case, we cannot find that the jury clearly lost its way. We agree that much of the testimony in this case was conflicting as to whether appellant actually fired the shot that proved fatal to Anthony Hoffman. Nevertheless, Osbin's undisputed testimony identified Greene as the person who hit Hoffman in the head with the barrel of a "big" gun, i.e., a .45 caliber or nine millimeter gun. The photographs offered into evidence show several deep parallel gashes above and running into the left eyebrow of the victim. From both the coroner's forensic testimony, including the entrance and exit wounds on the victim's left thigh, and Lentz's testimony, the jury could reasonably infer that Hoffman was struck on the left forehead by either a .45 caliber or nine millimeter gun with a grooved barrel. We conclude this evidence is sufficient to support a finding that Powell Greene knowingly caused or attempted to cause Anthony Hoffman serious physical harm by striking him in the head with a firearm. Thus, the jury's verdict is not against the manifest weight of the evidence.
Appellant's fourth assignment of error is found not well-taken.
On consideration whereof, we find appellant was not prejudiced or prevented from having a fair trial. The judgment of the Sandusky County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Melvin L. Resnick, J., JUDGE
James R. Sherck, J., JUDGE
Richard W. Knepper, J., JUDGE
CONCUR.