[Cite as *State v. Vielma*, 2012-Ohio-875.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY


STATE OF OHIO,

      PLAINTIFF-APPELLEE,                   CASE NO. 11-11-03

      v.

MARY A. VIELMA,                       O P I N I O N

      DEFENDANT-APPELLANT.


**Appeal from Paulding County Common Pleas Court**
**Trial Court No. CR-10-553**

**Judgment Affirmed**

**Date of Decision: March 5, 2012**


APPEARANCES:

    *Timothy C. Holtsberry* for Appellant

    *Joseph R. Burkard* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Mary A. Vielma (hereinafter "Mary"), appeals the Paulding County Court of Common Pleas' judgment entry of conviction. For the reasons that follow, we affirm.

{¶2} On October 18, 2010, the Paulding County Grand Jury indicted Mary on one count of domestic violence in violation of R.C. 2919.25(A), (D)(3), a fourth degree felony. (Doc. No. 2).

{¶3} On October 25, 2010, Mary was arraigned upon the indictment and entered a plea of not guilty. (Doc. No. 11).

{¶4} On February 23, 2011, the parties filed a written stipulation allowing for the results of Mary's polygraph examination to be introduced at trial. (Doc. No. 22).

{¶5} On March 22, 2011, the matter proceeded to jury trial, and the jury found Mary guilty. (Doc. No. 28). On April 11, 2011, the trial court filed its judgment entry of conviction. (Doc. No. 31).

{¶6} On May 12, 2011, the trial court sentenced Mary to three years community control upon several special conditions, including that she: (1) serve forty-five (45) days in local jail; (2) enter into and successfully complete a domestic violence or mental health program; (3) abstain from the consumption of alcohol and the use of controlled substances and not enter into establishments that

sell alcohol; (4) have no contact with the victim, David Vielma; and (5) pay a $250.00 fine. (Doc. No. 33). The judgment entry of sentence was filed on May 16, 2011. (Id.).

{¶7} On June 14, 2011, Mary filed a notice of appeal. (Doc. No. 40). Mary now appeals raising four assignments of error for our review. We elect to address Mary's assignments of error out of the order presented in her appellate brief.

### ASSIGNMENT OF ERROR NO. III

### THE TRIAL COURT ERRED AS THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶8} In her third assignment of error, Mary argues that her domestic violence conviction was against the manifest weight of the evidence. Specifically, Mary argues that the evidence failed to demonstrate that she *knowingly* caused or attempted to cause physical harm to her husband, David.

{¶9} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175

(1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶10} The criminal offense of domestic violence is codified in R.C. 2919.25, which provides, in pertinent part: "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(A). "[I]f the offender previously has pleaded guilty to or been convicted of domestic violence * * *, a violation of division (A) * * * of this section is a felony of the fourth degree * * *." R.C. 2919.25(D)(3). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶11} Paulding County Sheriff's Deputy Gary Robert Dietrick testified that, on September 23, 2010 shortly after 10:00 a.m., Mary reported that David Vielma (hereinafter "David") broke her car windshield. (Mar. 22, 2011 Tr. at 15-17). Dietrick testified that, as he was talking to Mary, David called the Sheriff's Office and told the dispatcher that the only reason he broke the windshield was because Mary hit him with her vehicle. (*Id*. at 16). Concerning what he observed when he arrived at Mary's home, Dietrick testified:

> Mary was standing beside her --I think it was a '94 Ford Explorer,
> and she showed me the windshield on the passenger's side was

broken quite a bit. She told me that she had been at the bus stop, which is at that store, I believe in Haviland and Main Street. Because there was a two-hour delay for school, I believe, for fog, she was waiting for her son to be picked up from the school bus, and she seen David on his bicycle leaving town eastbound of Main Street, State Route 114.

She told me that she had to go see a friend also in Van Wert, so she also drove eastbound on 114. And when she approached US 127 at the stop sign, David was just south of the intersection, about 20 feet, she said. She told me when she made the right turn to head south on 127, David, for no reason at all, picked up his bicycle and threw it at her car and then broke her windshield with his fist and told her to stay the fuck away from him. And then she stated she returned home and called me. (*Id*. at 17).

Dietrick testified that he informed Mary that he could not charge David with damaging her windshield since she was married to David. (*Id*. at 18). He testified that he then told Mary that David had indicated that she hit him with the vehicle. (*Id*.). Dietrick testified that the windshield was "caved in a little bit" and "spider webbed," but he did not observe any scratches on the vehicle consistent with a bicycle being thrown at it. (*Id*.).

**{¶12}** Dietrick testified that he then went to talk with David about what happened, and David reported that:

> * * * he had seen Mary at the bus stop. And there's been quite a bit of history between Mary and David not getting along. He said that he intentionally rode around the block just to avoid going by the school where she was at with the child just to keep from having a confrontation. He said he rode his bike to 127 and turned south. He was riding along the west side of the road, which would be along the southbound lane. He told me he was approximately a half mile south of the intersection of 114 just past the culvert when Mary had driven past him heading southbound on 127. He said she turned around in a driveway, headed back northbound on 127. And when she got back up to him, she had pulled over to the right of the northbound lane, which would be on the east side of the road, waited for a semi to go past her. Once the semi went past her going northbound, she did a U-turn, and in that U-turn, she got on his side. She hit his bicycle with her car, knocking it down. (*Id*. at 19-20).

Dietrick testified that Mary has been convicted of domestic violence in the past, and he identified State's exhibit one as a judgment entry indicating that Mary pled guilty to domestic violence in October 1997. (*Id*. at 20). Dietrick identified State's

exhibit two as a satellite photo showing the area where the incident occurred. (*Id.* at 22). Dietrick testified that Mary indicated that the incident occurred twenty feet south of the intersection of State Route 114 and U.S. 127, but David and Shawn Puckett indicated that the incident occurred south of the culvert pipe for the creek that crosses underneath U.S. 127, three-tenths to four-tenths of a mile south of the intersection. (*Id.*); (State's Ex. 2). According to Dietrick, Puckett lives about six-tenths of a mile south of the intersection on U.S. 127. (*Id.*).

{¶13} Dietrick testified that, after talking with Mary and David, he went to Shawn Puckett's residence. (*Id.* at 24). Puckett told him "he heard some yelling and looked up toward the yelling, which would be north of his residence, and saw David picking up his bicycle, and the vehicle being right where David was at." (*Id.*). Dietrick identified State's exhibit three as a photograph he took of David's arm on September 23, 2010. (*Id.* at 24-25). According to Dietrick, David had "small abrasions" and "small stones and dust" on his forearm. (*Id.* at 25). Dietrick identified State's exhibit four as photographs of Mary's vehicle. (*Id.* at 25-26). Dietrick testified that he did not witness any damage to Mary's vehicle consistent with a bike being thrown at it. (*Id.* at 26). Dietrick testified that, after he spoke with Puckett, he returned to Mary's house and placed her under arrest for domestic violence. (*Id.* at 26). According to Dietrick, Mary then informed him that she had a friend, Chris Diaz, who witnessed the incident at the corner of S.R. 114 and U.S.

127. (*Id*. at 26). Dietrick testified that he allowed Mary to call Diaz to have her come to the house and tell him what she saw. (*Id*. at 26-27). According to Dietrick, Diaz told him that she "was looking out the front window of her house and saw Mary turn to David and he threw the bike at her vehicle." (*Id*.). Dietrick asked Diaz to come to the Sheriff's Office to provide a formal written statement but Diaz never did. (*Id*. at 27). On cross-examination, Dietrick testified that Mary was very upset when he first talked to her. (*Id*. at 28). Dietrick testified that he did not observe any "fresh" damage to Mary's vehicle that would indicate a bike being thrown at it. (*Id*. at 29). Dietrick further testified that David and Mary have a history of complaints to the Sheriff's Office, and, over the years, he has investigated a dozen to twenty complaints, himself. (*Id*.). David stated he was wearing a short-sleeved shirt at the time of the incident, according to Dietrick. (*Id*. at 31).

{¶14} David Vielma testified that he was married to Mary on the date of the incident, September 23, 2010, and is still married to her. (*Id*. at 32-33). David testified that, around the time of the incident, he was not living with Mary but staying in a residence on U.S. 127, and Mary was residing in a house in Haviland with their son, Kaedin. (*Id*. at 32-34). David testified that, on September 23, 2010, he rode his bicycle north on U.S. 127 to Haviland to get a pack of cigarettes at the store. (*Id*. at 34-35). David testified that, after he purchased his cigarettes, he

"made it a point to go around two extra blocks instead of going right past Mary just because [they] had been arguing and fighting for days, and [he] just wanted to avoid her." (*Id*. at 35). David testified that his relationship with Mary was "[r]eally bad," which is why they did not live together. (*Id*. at 36). David testified that Mary was at the bus stop with Kaedin that morning around 9:00 to 9:30 a.m. since there was a two-hour fog delay for school. (*Id*.). David denied having any contact with Mary while he was in town that day. (*Id*. at 37). David further testified:

Q: What did you do next after you left the store?

A: I left, I went -- instead of coming out and going directly past where she was, I went out an extra block, two blocks, I think, just so I could come out past her and go on out on 114, turn right to 127.

Q: Which direction of 127 did you take to go --

A: South.

Q: Okay. As you were traveling south on State Route 127, did anything unusual happen?

A: Yeah.

Q: Tell me about what happened?

A: I was riding on my bicycle, and she went by, seemed like it was twice, I think, yelling and screaming at me and slowing down,

yelling stuff. And I kept telling her to get away from me, leave me alone. It was right on the highway. Cars were coming and everything.

* * *

Q: And was there any contact the first time that she went past you?

A: Nothing, other than verbal, I mean, her yelling at me, and she went on down further.

Q: On that first drive-by, did you do anything to incite her or to cause her to become agitated?

A: No. I was trying to avoid her from the beginning, trying to just get my cigarettes and get back home.

Q: So when Mary passed you the first time, what happened next? Where did she go and where did you go?

A: She went on past me. She turned into a driveway on the side of the road and then come back.

Q: So she was traveling northbound on 127 at that time?

A: At that time, yeah.

Q: And had you continued to drive your bicycle or had you stopped?

A: No. I kept going, going south, trying to get back to the garage.

Q: Okay. So as Mary passed you with her vehicle going northbound, what happened next?

A: She turned around somewhere behind me and come back again. Seems like she did that twice, I think. The second time she went past me, she went down into a side road or something off to the left and backed up and came back. And that time when she did, she went all the way off of the -- what was then the northbound lane. She went all the way to the east of the road completely. A semi went by. And after the semi went by, she did a big U-turn and came over toward where I was at, going like that with a truck like she was trying to hit me. And then she did with the corner of the bumper on the bike, and I fell and got up and I hit her windshield. (*Id*. at 37-40).

David testified that Mary's vehicle was not completely southbound when she hit him but was diagonal across the road. (*Id*. at 40). According to David, Mary hit the front of his bike "[j]ust hard enough to knock [him] off balance," with a force equivalent to a "1 or 2" on a scale of one to ten, with ten being the greatest amount of force. (*Id*. at 41). David identified State's exhibit three as a photograph of the injuries he sustained as a result of getting knocked off his bike. (*Id*. at 42). David further testified that he has known Shawn Puckett for years, and he was previously married to Puckett's sister. (*Id*. at 43). David testified that Mary hit him "between

the creek and the little bridge" on U.S. 127, not near the intersection of S.R. 114 and U.S. 127. (*Id*. at 44). David testified that, after Mary knocked him to the ground, he "got up and [he] took [his] fist and hit the edge of the windshield." (*Id*.). David testified that, during and leading up to the incident, Mary was accusing him of being with another woman. (*Id*. at 45).

{¶15} On cross-examination, David testified that it was a nice summer day when the incident occurred, and he was wearing a t-shirt with a flannel shirt over top. (*Id*. at 46). David testified that he did not indicate that Mary passed him a few times on U.S. 127 in his written statement. (*Id*. at 47). David testified that he was not sure how many times Mary turned around, but it was more than once like he indicated in his written statement. (*Id*.). David testified that a doctor told him he suffered from depression, and he was prescribed medication for his depression, but, as of September 23, 2010, he was not taking the medication. (*Id*. at 49). According to David, another doctor told him that he might be bipolar, though he denied being diagnosed as such. (*Id*. at 50). David testified that his bike was not damaged other than scratches. (*Id*. at 51). David testified that he did not stop by Puckett's house after the incident; however, Mary turned her vehicle around in Puckett's driveway and almost hit him again. (*Id*.). David testified that he was previously convicted of a felony in the late 1990's and again in 2005 or 2006 for failing to pay child support. (*Id*. at 52). On re-direct, David testified that, after

Mary hit him and he got back up, he started to walk down U.S. 127 with his bicycle by his side when Mary drove up and pulled right in front of him into Puckett's driveway almost striking him with her vehicle again. (*Id*. at 54-55).

{¶16} Shawn Puckett testified that, on September 23, 2010, he was residing at 2465 U.S. 127. (*Id*. at 56-57). Puckett testified that he was familiar with Mary and David, but he does not socialize with them. (*Id*. at 57). Puckett testified that, on the morning of September 23, 2010, he was working on his boat in his yard that morning when he heard people hollering and screaming at each other. (*Id*. at 57-58). According to Puckett, when he walked to the front of his house, he saw David picking his bike up off the side of the road, and Mary was in her vehicle at the side of the road. (*Id*. at 58). Puckett identified State's exhibit four as a photograph of Mary's vehicle, which he observed stopped on the side of the road on September 23, 2010. (*Id*.). Puckett estimated that he was about 200-300 yards from the incident, and his view of the incident was unobstructed. (*Id*. at 59). Puckett testified:

> I just blowed it of[f]. I figured they were just fighting. I went back
> and started working on my boat again. And then I could hear them -
> - within seconds later, I could hear Dave. I couldn't hear her. I
> could hear Dave hollering back at her. Then he rode by my house.

And then right in front of my house, she pulled in my driveway and

was within inches of hitting the bike again. (*Id*. at 59-60).

When asked if David did anything to incite Mary, Puckett testified, "[o]ther than

the name calling, no." (*Id*. at 60). Puckett testified that he told Deputy Dietrick

what he witnessed, and, prior to that, he did not have any contact with David. (*Id*.

at 62). On cross-examination, Puckett testified that David was riding his bicycle

when Mary almost struck him near his driveway. (*Id*. at 63). Puckett testified that

the incident occurred just south of the creek, between the creek and his neighbor's

house on the east side of the road. (*Id*. at 63-64).

{¶17} Following a brief lunch recess, the State recalled Puckett to the stand

to clarify his testimony concerning the location of the incident. (*Id*. at 69). Puckett

testified that Mary's vehicle was facing south, and David was off the road on the

passenger's side of the vehicle—the same side of the road his house is on, which is

the *west* side of the road. (*Id*. at 70). On cross-examination, Puckett testified that

he was confused when he earlier testified that the incident occurred on the east

side of the road. (*Id*. at 71). Puckett testified that, during the lunch recess, he took

David to the gas station to get a pop but did not talk to David about the case. (*Id*.).

{¶18} Steven Stechschulte testified that he has been employed as a

polygraph examiner with the Bureau of Criminal Identification and Investigation

(BCI & I) for sixteen years. (*Id*. at 72-73). Stechschulte testified that he

- 15 -

performed a stipulated polygraph test on Mary, and the test results indicated deception when Mary was asked questions relevant to the investigation. (*Id*. at 76, 88-89). Stechschulte identified State's exhibit six as a copy of his report. (*Id*. at 88-89). When asked what the pertinent question was when he was looking for deception, Stechsculte testified, "whether or not David had been knocked off of his bicycle or hit by Mary Vielma." (*Id*. at 89). On cross-examination, Stechschulte testified that physical pain could affect a person's involuntary systems, which the polygraph machine relies upon. (*Id*. at 90). Stechsculte testified that, when he asked Mary if she had anything physically wrong with her within the past five years, Mary indicated she had an accident and suffered from neck pain. (*Id*. at 91). On re-direct, Stechschulte testified that Mary did not indicate any anxiety or pain that would have caused him concern to stop the test. (*Id*. at 97-98).

{¶19} Thereafter, the State moved to admit all six of its exhibits without objection. (*Id*. at 101). Mary made a Crim.R. 29(A) motion for acquittal, which was denied. (*Id*. at 101-104). The defense then called two witnesses to the stand. Mary testified concerning the events of September 23, 2010 as follows:

> We had a two-hour delay because of fog that morning. It was cold.
>
> I was waiting at the bus stop. David was coming in from 127 on the
>
> south side of 114 -- or on the north side of 114, down the sidewalk

- 16 -

past me. He then went into my brother's business, Station. * * * He came out, went into the post office. I'm outside of my vehicle talking to my children. * * * My son got on the bus. I started out -- it would be east on 114 towards 127. I looked to my left to see, you know, if I could go, and then I just -- I just turned, and there he was about 20, 30 feet from the corner. * * * I could tell he was angry. He jumped off of his bike. He grabbed it by the center bar and threw it at my car. And I must have been going no more than 5 mile an hour. I just had turned the corner. * * * He screamed, stay away from me you F-ing bitch and I'm going to F-ing kill you. * * * He jumped over his bicycle. He took one swing at my windshield and destroyed my windshield. * * * I was upset. I was very upset. I accelerated as fast as I could to get out of there. I really did. And I went down --I turned around -- I was going to continue on and go up to Scott, which was just south of there a couple miles and go up the back road, but the first time a truck passed me, my windshield started shaking and I was afraid it was going to blow in on me. So, I decided to turn around and go back the same route I came. I passed him. I would have been on the east side of 127. He was still on the west side of 127. And I drove -- turned west on 114. I drove up to

my brother's business. I went in and got my sister-in-law and told her what had happened. I told her I had already called the Sheriff's Department. (*Id.* at 106-109).

Mary denied ever striking David with her vehicle. (*Id.* at 109-110). Mary denied that she almost hit David near Puckett's driveway. (*Id.* at 110). Mary testified that, about a half hour after the incident happened, a witness text messaged her saying she saw David throw his bike and asking her if she was alright (*Id.* at 110-111). Mary identified defendant's exhibit B as a picture demonstrating where the witness was located in relation to where the incident occurred. (*Id.* at 111-112). Mary estimated that the witness was approximately one-eighth to one-quarter of a mile away from the incident. (*Id.* at 112). Mary further testified that she was asked to take a polygraph examination after the case was initiated. (*Id.* at 112-113). Mary testified that she had been in an accident October 13, 2010, which was prior to her polygraph examination. (*Id.* at 113). She testified that she was prescribed several pain medications following the accident, and she was in pain during the examination. (*Id.* at 113-114).

{¶20} On cross-examination, Mary testified that she did not see David leave town on the day of the accident, and she thought David went to someone's house. (*Id.* at 115). When asked why she said she saw David leave the store headed toward U.S. 127 in her written statement, Mary testified, "[h]e did, but he

disappeared somewhere in between." (*Id*. at 116). Mary testified that she was going to see a friend in Van Wert, Beverly Plummer, who she had not seen in years but had recently reconnected with. (*Id*.). When asked if she would have had to travel on S.R. 114 and then South on U.S. 127 to go to Van Wert, Mary testified, "I could have went back roads, but it was foggy that day at one point, and I chose to take the main highway." (*Id*.). However, Mary then testified that it was not foggy after her child got on the school bus, so she could have taken a different route to Van Wert but she chose not to. (*Id*. at 116-117). Mary testified that she had pictures on her cell phone of damage to her vehicle that David caused when he threw his bike, but she did not have her cell phone with her. (*Id*. at 117). Mary testified that her witness, Christi Diaz, is her cousin. (*Id*.). Mary testified that Puckett lied about what happened because "David had been doing work for [Puckett]. David is very, very cheap. [Puckett] likes David. David was his ex-brother-in-law * * * [t]hey do have a friendship or relationship." (*Id*. at 118-119). Mary testified that she had a volatile relationship with David, though she denied that she was angry with David when he refused to pursue Social Security benefits. (*Id*. at 119). Mary testified that she receives Social Security benefits to provide for her child. (*Id*. at 120). Mary testified that she told Stechschulte that she was in a lot of pain on the day of the polygraph examination. (*Id*. at 120). Mary testified that she thought polygraph exams could be reliable "[u]nder the right

circumstances," but, with respect to her polygraph exam, Mary testified "that there are reasons for it not to come back correctly, and I know in my heart that that is what it is." (*Id*. at 121). Mary testified that David lied when he testified that she hit him. (*Id*. at 122-123).

{¶21} On re-direct examination, Mary testified that she initially was reluctant to provide Deputy Dietrick with a written statement since he indicated that he did not see any reason to charge David, but she did provide a written statement on September 24th. (*Id*. at 123). Mary testified that she did ask the polygraph examiner at least once to move her arm during the examination. (*Id*. at 125). On re-cross examination, Mary testified that she provided her attorney with documentation of the medical injuries she sustained prior to the polygraph examination. (*Id*. at 125-126). Mary testified that she did not keep the text message her witness sent on the day of the incident. (*Id*. at 126).

{¶22} Christi Diaz testified that, on September 23, 2010, she was living at 12919 State Route 114, Haviland, Ohio. (*Id*. at 126). Diaz testified that, as she was picking up trash by the road in front of her house, she saw Mary's vehicle parked on the side of the highway, and she saw David reach down and grab his bike and throw it towards Mary's vehicle. (*Id*. at 128-129). Diaz testified that she also saw David raise his hands up toward the vehicle's windshield, but she could not say for sure whether David hit the vehicle with his bike or hit the windshield

with his hands. (*Id*. at 129). Diaz identified defendant's exhibit B as a photograph of a SUV (not the defendant's vehicle) taken from her driveway, which was representative of her view of the incident. (*Id*. at 129-130). Diaz testified that, after she witnessed the incident, she finished picking up the trash, walked into the house, and then sent Mary a text message about 15-20 minutes later asking her if she was alright. (*Id*. at 131). According to Diaz, Mary called her back about five minutes after receiving her text message and asked her to speak with Deputy Dietrick. (*Id*. at 132). Diaz testified that she spoke with Dietrick, but she never wrote a statement because she was afraid of David and his friends. (*Id*.).

{¶23} On cross-examination, Diaz testified that she was Mary's first cousin, but she was not very close to Mary. (*Id*. at 133). When asked how David threw his bike, Diaz testified that David did not throw it over his head but did not just push it over either. (*Id*. at 134). Diaz testified that she could not tell whether David's bike hit Mary's car or whether David actually struck Mary's windshield with his hands. (*Id*. at 134-135). Diaz testified that David and Mary have a violent relationship, and she has seen them fight in the past. (*Id*. at 135). Diaz testified that she did not see Mary pull into Puckett's driveway or hit David down by the culvert pipe. (*Id*. at 136). Diaz testified that she cannot see Puckett's driveway or the culvert pipe area from her house. (*Id*.).

**{¶24}** At that point, defendant's exhibits A and B were admitted into evidence with no objections. (*Id*. at 138-139). The defense rested, and then, the State offered the testimony of Shawn Puckett in rebuttal. (*Id*. at 139). Puckett testified that Mary turned around in his driveway on the day of the incident. (*Id*. at 139-140). Puckett testified that he had no doubt that he saw David picking up his bike near the culvert or bridge area, and Mary's vehicle was right there. (*Id*. at 140). Puckett testified that there was nothing that would have impeded his vision of the incident. (*Id*.). On cross-examination, Puckett testified that he never actually saw Mary hit David. (*Id*. at 141). Thereafter, the State rested; the defense renewed its Crim.R. 29(A) motion; closing arguments were made; the jury was instructed; the matter was submitted to the jury; and, the jury returned a verdict of guilty. (*Id*. at 141-164).

**{¶25}** After reviewing the evidence presented, we cannot conclude that Mary's domestic violence conviction was against the manifest weight of the evidence. David testified that Mary made a U-turn on U.S. 127, swung her vehicle across the road, and hit him while he was riding his bicycle. (Mar. 22, 2011 Tr. at 37-40). David's testimony that Mary made an affirmative effort to strike him—by turning her vehicle around several times and making a U-turn on U.S. 127— demonstrates that she acted knowingly. The State submitted photographs showing that David had scrapes on his forearm indicative of falling off of a bike onto a

roadway. (State's Ex. 3). Deputy Dietrick testified that he observed "small stones and dust" on David's forearm, which is also consistent with David's testimony that Mary knocked him off his bike "off the right side of the stones or the berm of the road and hit [his] forearm on that." (Mar. 22, 2011 Tr. at 25, 41). The photographs of Mary's vehicle show a broken windshield consistent with David's admission that he punched the windshield; however, the photographs of Mary's vehicle do not demonstrate any damage to the vehicle consistent with Mary's or Diaz's testimony that David threw his bike at the vehicle. (State's Ex. 4); (Mar. 22, 2011 Tr. at 44, 106-109). Deputy Dietrick testified that he did not observe any scratches or dents on Mary's vehicle that would have resulted from the bike being thrown at it. (Mar. 22, 2011 Tr. at 18). David admitted to the dispatcher at the Sherriff's Office and at trial that he punched Mary's windshield but only because Mary struck him with her vehicle and knocked him off his bike. (*Id*. at 16, 44). David testified that his bicycle had no physical damage other than scratches, which is unlikely had David thrown his bike as Mary alleged. (*Id*. at 51). Although she said she had pictures on her cell phone of the damage caused to her vehicle when David threw his bike at it, Mary could not produce those photographs at trial. (*Id*. at 117).

{¶26} Puckett testified that he saw David picking his bike up off the side of the road, and Mary was in her vehicle at the side of the road by David, which is

consistent with Mary knocking David off the bike. (*Id*. at 58). Puckett also testified that Mary almost hit David again when she turned around in his driveway. (*Id*. at 63). This testimony tends to corroborate David's allegation that Mary actually hit him; it also shows that Mary acted knowingly. Mary's witness, Diaz, admitted that she could not see Puckett's driveway or the culvert area on U.S. 127 from her house. (*Id*. at 136). Consequently, Diaz could not confirm or deny Puckett's or David's testimony concerning what occurred at that location. Mary was unable to produce the alleged text message Diaz sent to her on the day of the incident. (*Id*. at 126). Diaz also failed to provide a written, sworn statement concerning what she allegedly witnessed, which raises a credibility concern. (*Id*. at 132). Furthermore, Diaz originally told Deputy Dietrick that she witnessed the incident from the window of her house, but testified at trial she was at the end of her driveway. (*Id*. at 26-27, 128-130). Mary's testimony that David "disappeared" for a while when he was in town also corroborates David's testimony that he rode his bike a block or two out of his way when leaving town to purposely avoid Mary. (*Id*. at 37, 55, 116). David also told Deputy Dietrick that he tried to avoid Mary on the day of the incident when he was questioned immediately following the incident. (*Id*. at 19-20). David's testimony that he tried to avoid Mary is further corroborated from David's previous act of moving out of the marital home to avoid conflict with his wife. (*Id*. at 34, 36). When Mary was asked about taking

an alternative route to her friend's house to avoid David, Mary indicated that she took the main routes, past David, since it was foggy. (*Id*. at 116). When questioned further, though, she admitted that it was not foggy when she left the bus stop, and she just decided to go on the main routes. (*Id*. at 116-117). David's testimony also indicated a viable reason for Mary's attack—Mary was accusing him of being with another woman. (*Id*. at 45). On the other hand, Mary told Deputy Dietrick that "David, for no reason at all, picked up his bicycle and threw it at her car and then broke her windshield with his fist and told her to stay the fuck away from him." (*Id*. at 17, 108). In addition to the above testimony, Stechschulte testified that Mary was deceptive during her polygraph examination. (*Id*. at 89); (State's Ex. 6). For all these reasons, we cannot conclude that Mary's conviction was against the manifest weight of the evidence.

{¶27} Mary's third assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED BY ALLOWING WITNESS SHAWN PUCKETT TO BE RECALLED TO THE STAND IN ORDER TO CHANGE HIS TESTIMONY.**

{¶28} In her second assignment of error, Mary argues that the trial court erred by allowing Puckett to be recalled to the stand to change his testimony.

{¶29} A trial court has the broad discretion to exercise "reasonable control over the mode and order of interrogating witnesses * * *." See Evid.R. 611. That

discretion extends to permitting a witness to be "recalled for the purpose of correcting or changing testimony which the witness, through error, mistake, or oversight, has previously given in a trial." *State v. McBride*, 5th Dist. No. 2008-CA-00076, 2008-Ohio-5888, ¶ 33, quoting *Stillson v. State*, 204 Ind. 379 (1933). *See also State v. Spirko*, 59 Ohio St.3d 1, 28 (1991). As such, we review a trial court's decision to permit or deny the recall of a witness for an abuse of discretion. *State v. Burneson*, 8th Dist. No. 88767, 2007-Ohio-4037, ¶ 8. An abuse of discretion is more than an error of judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶30}** Following a brief lunch recess after Puckett's testimony, the State recalled Puckett to the stand to clarify his testimony concerning the location of the incident. (Mar. 22, 2011 Tr. at 69). Before lunch, Puckett testified during cross-examination that the incident took place on the east side of U.S. 127; however, after lunch, Puckett testified that the incident took place on the west side of the road. (*Id.* at 70). Puckett testified that his previous testimony was wrong because he looked at the State's trial diagram incorrectly when he testified the first time. (*Id.*). On cross-examination, Puckett testified that he was confused when he earlier testified that the incident occurred on the east side of the road. (*Id.* at 71).

Puckett testified that he talked to David when he took him to the gas station to get a pop during the lunch recess, but he denied talking to David about the case. (*Id*.).

**{¶31}** Upon review, we cannot conclude that the trial court abused its discretion by allowing the State to recall Puckett to correct his testimony for the record. Puckett testified that his previous testimony that the incident occurred on the east side of the road was the result of his misreading of the State's trial exhibit (an enlarged diagram of the scene of the incident). The jury was instructed that they were free to believe or not believe any or all of the testimony of any witness. (*Id*. at 156-157). We find no error with the trial court's decision to clarify the record in this regard.

**{¶32}** Mary's second assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED BY NOT PROVIDING TO THE JURY INSTRUCTIONS REGARDING SELF DEFENSE, USE OF A POLYGRAPH EXAM, AND USE OF PRIOR CONVICTION OF DOMESTIC VIOLENCE.**

**{¶33}** In her first assignment of error, Mary argues that the trial court erred by not instructing the jury on self-defense, use of the polygraph examination, and use of Mary's prior domestic violence conviction.

**{¶34}** Since Mary failed to request the aforementioned jury instructions at trial, she has waived all but plain error upon review. *State v. Black*, 54 Ohio St.2d

304, 310 (1978), citing *State v. Williams*, 51 Ohio St.2d 112 (1977); Crim.R. 30(A). *See also State v. Turks*, 3d Dist. Nos. 1-10-02, 1-10-26, 2010-Ohio-5944, ¶ 17. We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 110 (1990), quoting *State v. Long*, 53 Ohio St.2d 91, paragraph three of the syllabus (1978). For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58 (1990).

{¶35} Mary first argues that the trial court erred by failing to instruct the jury on self-defense. Specifically, Mary argues that the evidence demonstrated that David was mentally unstable and angry, threatened to kill her, threw his bicycle at her vehicle, and broke her windshield.

{¶36} "'A trial court is not required to instruct the jury on self-defense in every case where it is attempted to be presented. The defendant must first present sufficient evidence at trial to warrant such an instruction.'" *State v. Barnd*, 85 Ohio App.3d 254, 259-260, (3d Dist. 1993), quoting *Bucyrus v. Fawley*, 50 Ohio

App.3d 25, 26 (3d Dist. 1988). Whether a defendant introduced sufficient evidence to raise an affirmative defense under R.C. 2901.05 is a question of law we review de novo. *State v. Belanger*, 190 Ohio App.3d 377, 2010-Ohio-5407, ¶ 4 (3d Dist.), citing *State v. Johnson*, 11th Dist. No. 2005-L-103, 2006-Ohio-2380, ¶ 24.

{¶37} To establish a claim of self-defense, the defendant must show that: (1) s/he was not at fault in creating the situation giving rise to the event; (2) s/he had a bona fide belief that s/he was in imminent danger of bodily harm; and (3) s/he did not violate any duty to retreat or avoid the danger. *State v. Melchior*, 56 Ohio St.2d 15, 20-21 (1978). *See also State v. Thomas*, 77 Ohio St.3d 323 (1997); *State v. Williford*, 49 Ohio St.3d 247 (1990); *State v. Jackson*, 22 Ohio St.3d 281 (1986); and *State v. Robbins*, 58 Ohio St.2d 74 (1979). "The degree of force one may use to defend oneself depends upon what is reasonably necessary to protect that individual from the imminent use of unlawful force." *Belanger*, 2010-Ohio-5407, at ¶ 4, citing *Akron v. Dokes*, 31 Ohio App.3d 24 (9th Dist. 1986). Where the defendant uses less than deadly force, s/he need only show a fear of bodily harm, not a fear of death or great bodily harm. *State v. Perez*, 72 Ohio App.3d 468 (10th Dist. 1991). Furthermore, in non-deadly force cases, the defendant need only show that s/he was not at fault in creating the situation, and that s/he had a

genuine belief that s/he was in imminent danger of bodily harm. *Belanger*, 2010-Ohio-5407, at ¶ 4, citing *Johnson*, 2006-Ohio-2380, at ¶ 21.

{¶38} After reviewing the testimony and evidence presented at trial, we are not persuaded that the trial court committed plain error by failing to instruct the jury on self-defense. Significantly, throughout the course of the trial Mary denied ever hitting David with her vehicle; consequently, the trial court did not err by failing to instruct the jury on self-defense. *City of Columbus v. Peoples*, 10th Dist. No. 05AP-247, 2006-Ohio-1718, ¶ 48, citing *State v. Martin*, 21 Ohio St.3d 91, 94 (1986). *See also State v. Tribble*, 2nd Dist. No. 24231, 2011-Ohio-3618, ¶ 55, quoting *State v. Powell*, 4th Dist. No. 96CA2257, at *5 (Sept. 29, 1997) ("'It would be nonsensical to permit a criminal defendant to completely deny that he committed the act underlying the charge, yet also claim that his commission of the act was justified and that he should therefore be excused from criminal responsibility.'").

{¶39} Mary next argues that the trial court erred by failing to instruct the jury on the proper use of her polygraph examination under *State v. Souel*, 53 Ohio St.2d 123 (1978). Again, since Mary failed to request this instruction at trial, she has waived all but plain error on appeal. *Black* at 310, citing *Williams*, 51 Ohio St.2d 112; *Turks* at ¶ 17; Crim.R. 30(A).

**{¶40}** In *State v. Souel*, the Ohio Supreme Court held that a trial court may admit the results of a stipulated polygraph examination for purposes of corroboration or impeachment provided that certain conditions were met. 53 Ohio St.2d 123, at syllabus. Pertinent here is the condition that the trial court "should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged, and that it is for the jurors to determine what weight and effect such testimony should be given." *Id*. at ¶ 4 of the syllabus. While the trial court sub judice failed to instruct the jury as required under *Souel*, we cannot conclude that this error amounted to plain error in this case since there was substantial other evidence of Mary's guilt. *State v. Rutherford*, 2nd Dist. No. 2001-CA-122, 2002-Ohio-1214, citing *State v. Coy*, 2nd Dist. No. 14415 (Mar. 22, 1995). While the Tenth District has found that trial court's failure to instruct the jury as required under *Souel* constitutes plain error, those cases involved polygraph examinations of the complaining witness or the co-defendant, not the defendant like in this case. *State v. Lascola*, 61 Ohio App.3d 228 (1988) (complaining witness); *State v. Rowe*, 68 Ohio App.3d 595 (1990) (no stipulation and co-defendant); *State v. Fisk*, 10th Dist. No. 01AP-1193, 2002-Ohio-2776, ¶ 72-75 (*Lascola* involved the polygraph examination of the complaining witness, not the defendant). We further note that the polygraph examiner testified at trial, subject to cross-examination, and Mary testified

concerning why she felt her polygraph examination was incorrect. Under these circumstances, we cannot conclude that the trial court's failure to instruct the jury on the use of Mary's polygraph examination constituted plain error.

{¶41} Next, Mary argues that the trial court erred by failing to instruct the jury on the limited use of her prior domestic conviction. Again, Mary failed to request this instruction, so she is limited to plain error on appeal. *Black* at 310, citing *Williams*, 51 Ohio St.2d 112; *Turks* at ¶ 17; Crim.R. 30(A).

{¶42} Domestic violence is a fourth degree felony if the defendant has a prior conviction for domestic violence. R.C. 2919.25(D)(3). "The prior conviction is an essential element of the offense if it enhances the penalty, and the jury must determine the existence of a prior conviction as a factual matter before the trial court can impose a greater punishment." *State v. Gibson*, 8th Dist. No. 92275, 2009-Ohio-4984, ¶ 42, citations omitted. The trial court sub judice instructed the jury, in relevant part:

> The Defendant is charged with one count of domestic violence, as charged in the indictment. You must find beyond a reasonable doubt that on or about the 23rd day of September 2010, and in Paulding County, Ohio, the Defendant did knowingly cause or attempt to cause physical harm to David Vielma, a family or household member, having previously been convicted of domestic violence in

case 97CRV527 in the Van Wert Municipal Court in Van Wert, Ohio, October 14th, 1997.

* * *

If your verdict is guilty, you will separately determine whether the Defendant was previously convicted of domestic violence. If your verdict is not guilty, you will not determine whether the Defendant was previously convicted of domestic violence. (Mar. 22, 2011 Tr. at 157-159).

**{¶43}** The Court of Appeals for the Eighth District was presented with a similar case in *Gibson*, supra. The defendant in *Gibson*, like Mary here, was convicted of fourth degree domestic violence based upon his prior domestic violence conviction. 2009-Ohio-4984, at ¶ 42. The trial court in *Gibson*, like the trial court herein, instructed the jury that it should "separately determine" whether the defendant was previously convicted of domestic violence *after* it determined the defendant was guilty of domestic violence on the date alleged in the indictment. *Id.* Although the Appellate Court in *Gibson* acknowledged that a limiting instruction was "clearly preferable," it found that the trial court's failure to provide it was not plain error since there was substantial other evidence of the defendant's guilt. *Id.* at ¶ 42, 47. Likewise, we conclude that the trial court's failure to provide the limiting instruction here does not rise to the level of plain

error since there was substantial other evidence of Mary's guilt, including: the testimony of the victim, the testimony of an eyewitness, Puckett, the physical evidence of the victim's injuries, and the nature of the damage to Mary's vehicle.

{¶44} Finally, Mary argues that the trial court committed reversible error in light of the cumulative effect of all the aforementioned errors. Under the cumulative error doctrine, "[a]lthough violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191, 196-197 (1987). After reviewing the record in this case, we are not persuaded that Mary was denied her constitutional right to a fair trial.

{¶45} Mary's first assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. IV**

**APPELLANT WAS DENIED HER CONSTITUTIONAL RIGHT OF EFFECTIVE ASSISTANCE OF COUNSEL.**

{¶46} In her fourth assignment of error, Mary argues that trial counsel was ineffective for: (1) failing to request the aforementioned jury instructions; (2) allowing Puckett to be recalled to the stand to correct his trial testimony; and (3) failing to present more evidence of self-defense.

**{¶47}** A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Bradley*, 42 Ohio St. 3d 136, 142 (1989), citing *Strickland*, 466 U.S. at 691. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694.

**{¶48}** In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of

counsel's essential duties to his client. *See Bradley*, 42 Ohio St. 3d at 141-142, quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

**{¶49}** Mary has failed to demonstrate ineffective assistance of trial counsel. The trial attorney's decision not to request jury instructions on Mary's prior convictions and her polygraph examination could have been counsel's purposeful effort not to over-emphasize these issues as a matter of trial strategy. *State v. Kinney*, 4th Dist. No. 07CA2996, 2008-Ohio-4612, ¶ 20 (prior convictions); *State v. Lacey*, 2nd Dist. No. 83-CA-58, at *4 (Oct. 5, 1984) (polygraph instruction). Even if these decisions were not a matter of trial strategy, Mary has failed to demonstrate a reasonable probability that, but for counsel's alleged errors, the outcome of the trial would have been different. Since we have already determined that the evidence presented did not support a self-defense instruction, trial counsel was not ineffective for failing to request one. *See e.g. State v. Daviduk*, 5th Dist. No. 2001 CA 00340, 2002-Ohio-773. Furthermore, trial counsel's failure to present evidence of self-defense was consistent with his overall theory of the case (trial strategy)—that Mary never hit David. Finally, we cannot conclude that trial counsel's decision not to object to the State recalling Puckett constituted ineffective assistance of counsel. Aside from this decision falling within the rubric of trial strategy, Mary has failed to demonstrate that the outcome of her trial would have been different but for Puckett's additional testimony.

{¶50} Mary's fourth assignment of error is, therefore, overruled.

{¶51} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**SHAW, P.J., concurs.**

**ROGERS J., DISSENTS.**

{¶52} I respectfully dissent from the opinion of the majority on three issues. The first two issues are instructions which the trial court failed to include in its final jury instructions. In my opinion, there can be no case in which the failure to instruct the jury on the results of a polygraph examination, and/or a prior conviction is not error. These issues are inherently prejudicial and should never be ignored. Furthermore, in my opinion the failure of trial counsel to demand such instructions in this case was an egregious error. I would find that the combined errors of failure to instruct and the ineffective assistance of counsel by failure to request those instructions render the verdict suspect. I would therefore reverse and remand the case for a new trial.

{¶53} Although not specifically argued by the Appellant, I am appalled by the extent to which the Deputy was permitted to testify to what was told him by

the parties. While it is reasonable to permit limited inquiry as to statements of the parties for the purpose of explaining what actions are then taken by law enforcement, the testimony here far exceeded what was necessary or proper. The admission of extensive out-of-court statements by the parties tends to suggest reliability to those statement's, and to the witness's interpretation of credibility, or lack of credibility, of the declarant. It also appears that the majority has relied upon the Deputy's version of those out-of-court statements as an additional measure of the weight of the evidence.

{¶54} For all these reasons I would reverse and remand the case for a new trial.

**/jlr**