[Cite as *State v. Hodson*, 2019-Ohio-1734.]

# IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 18AP-242 |
| | | (C.P.C. No. 16CR-6642) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Jeffrey L. Hodson, | : | |
| Defendant-Appellant. | : | |

---

## D E C I S I O N

### Rendered on May 7, 2019

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie B. Swanson*, for appellee. **Argued:** *Valerie B. Swanson.*

**On brief:** *Blaise G. Baker*, for appellant. **Argued:** *Blaise G. Baker.*

---

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Jeffrey L. Hodson, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of three counts of rape, one count of gross sexual imposition, and one count of tampering with evidence. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On December 1, 2016, plaintiff-appellee, State of Ohio, indicted Hodson on three counts of rape in violation of R.C. 2907.02, felonies of the first degree; one count of gross sexual imposition in violation of R.C. 2907.05, a felony of the third degree; and one count of tampering with evidence in violation of R.C. 2921.12, a felony of the third degree.

Hodson pleaded not guilty, and the matter was tried to a jury in February 2018. As pertinent to this appeal, the following evidence was adduced at trial.

{¶ 3} L.H. ("grandmother") and F.H. ("grandfather") are E.H.'s grandparents. Grandmother testified as follows. Grandmother's daughter, H.H., is married to Hodson. Grandmother and grandfather frequently babysit their grandchildren, including H.H. and Hodson's children, E.H. and N.H. On October 7, 2016, grandmother and grandfather were babysitting E.H., N.H., and two other grandchildren when E.H., who was four years old at the time, said her father had sexually assaulted her. The four children were playing when E.H. "was holding a troll doll and was laughing because, you know, his butt was, you know, not covered, and she was laughing at that then she came over to me and said, Daddy puts his penis in my butt and it hurts." (Tr. Vol. I at 123.) Grandmother was shocked, and she asked E.H. to say this again to grandfather. E.H. repeated her statement to grandfather. Soon after this, Hodson called to say he was on his way to pick up his children. Grandmother was afraid and did not know what to do. Grandmother knew Hodson to have a bad temper and there "could possibly be a gun in [his] car" because he had two guns. (Tr. Vol. I at 124.) Grandmother called Hodson's sister, A.T. They did not report the abuse allegation immediately because they were trying to figure out the safest path to take. Because of their safety concerns, they waited until the following Monday, October 10, 2016, when Hodson returned the children for babysitting, to take E.H. to Nationwide Children's Hospital.

{¶ 4} Grandfather testified his relationship with his daughter, H.H., had deteriorated in recent years, and he blamed and resented Hodson for that change. On October 7, 2016, when he and his wife were babysitting their grandchildren, grandmother told E.H. to "go tell grandpa what you just told me." (Tr. Vol. II at 170.) E.H. said, "my daddy sticks his penis up my butt and it hurts." (Tr. Vol. II at 170.) Grandfather was "numb" and "stunned." (Tr. Vol. II at 170.) They were concerned to immediately report this allegation because Hodson "gets violent" and they wanted to ensure the children's safety. (Tr. Vol. II at 173.)

{¶ 5} Hodson's sister testified at trial and was asked whether she grew up in the same home as her brother Hodson. She explained they did grow up in the same home until she was 13 years old and he was 16 years old. Hodson was "sent to live at a home for

teenagers who were violent and couldn't stay at home or at school anymore and so he lived there for the next couple of years." (Tr. Vol. I at 157.) Upon learning of E.H.'s statements, grandmother, grandfather, and Hodson's sister developed a plan to have grandmother and grandfather take E.H. to the hospital the next time they babysat the children. Considering Hodson's "sometimes violent" and "erratic" behavior, they viewed this as the safest and best course of action. (Tr. Vol. I at 154.)

{¶ 6} Lauren Lathem, a clinical social worker and certified forensic interviewer at Nationwide Children's Hospital, interviewed E.H. when she was brought to the hospital on October 10, 2016. During that interview, which was video and audio recorded, Lathem asked E.H. if "somebody ever hurt your body?" (Tr. Vol. II at 210.) E.H. responded, "Well, my daddy sticks his penis in my butt and it hurts my body." (Tr. Vol. II at 210.) She indicated this occurs in her bedroom. She further stated that "it hurts very well but I don't know why he does that because he likes it and he loves me, that is why he does that." (Tr. Vol. II at 211.) She explained her father takes his clothes off and she sees him "put the penis" in her butt because she looks. (Tr. Vol. II at 215.) E.H. stated Hodson has pee in his penis. "And pee comes out on -- in the potty and he stands up to go potty." (Tr. Vol. II at 227.) E.H. stated Hodson touched her butt cheek with his fingers, and he pulls her pants down and "plays with [her] butt." (Tr. Vol. II at 225.) E.H. stated she cries and Hodson turns her on her back. E.H. told Latham that Hodson "tries to stick his -- his big fingers in there but it don't fit. It don't fit in my woohoo." (Tr. Vol. II at 217.) She said his fingers touched the inside of her woohoo. She also disclosed that Hodson licked her woohoo, which she said she "liked that" and "laughed" when he did that. (Tr. Vol. II at 220.) She identified her "woohoo" as her vagina based on an anatomical drawing shown to her. E.H. told Latham that her mother was at work when her father did these acts. E.H. also explained to Latham that Hodson would let her dog in the room and when the dog growled, E.H. told Latham "And daddy says, It's okay Scooby. He's not hurting me." (Tr. Vol. II at 221.) Based on her forensic interviewing experience, Latham summarily described E.H. as presenting "a strong disclosure for a four year old." (Tr. Vol. II at 234.)

{¶ 7} Amber Ball, a sexual assault nurse in the emergency department at Nationwide Children's Hospital, testified she examined E.H. Ball collected samples from E.H. using the evidence collection kit. During the vaginal swabbing, E.H. "stated that she

liked it, she was giggling and asked me to do it again and do it some more."  (Tr. Vol. II at 308-09.)  Ball had never had a child tell her that before.  Ball testified E.H.'s vaginal and anal exams revealed nothing abnormal.   She noted there was "discoloration * * * around the anus, a bluish like color when the patient beared down." (Tr. Vol. II at 281.)  There were no fissures, abrasions, swelling, or lacerations.  The reviewing doctor indicated the findings were nonspecific.  Ball testified the doctor stated, "The bluish discoloration noted perianally at 12:00 o'clock is consistent with venous pooling which is a normal finding.  The redness noted inside the anus left a normal finding.  A normal/nonspecific exam does not exclude the possibility of sexual assault."  (Tr. Vol. II at 307.)  Ball testified that, based on her experience and her knowledge of statistics gathered at the child advocacy center at Nationwide Children's Hospital, a low percentage of sexual assault exams reveal signs of physical trauma.

{¶ 8}  Ball did not test for genital herpes because E.H. did not have any active lesions.  However, Ball was informed the father has genital herpes after she performed the exam on E.H.  Based on this circumstance, she contacted the attending physician to determine if E.H. should be tested for genital herpes.  The physician confirmed to Ball that there was no need to test for genital herpes because E.H. had no active lesions; in the absence of an active lesion, there is no way to test for it.  Additionally, Ball testified E.H. was less at risk of getting genital herpes because she was prepubescent.

{¶ 9}  Robert Parker, a forensic scientist for the Columbus Division of Police, analyzed physical evidence collected in this case, which included pants, a shirt, a sheet, and underwear.  None of the items he tested were positive for blood or semen.  Jonathan Lucyshyn, another forensic scientist for the Columbus Division of Police, performed DNA analysis on the vaginal swabs, anal swabs, perianal swabs, and bilateral thigh swabs that were collected from E.H. during her exam.  Each of these samples tested positive for male DNA.  The vaginal swabs, perianal swabs, and bilateral thigh swabs were determined to be suitable for DNA analysis.  The male DNA detected in the anal swabs did not cross the threshold for being suitable for further processing.  However, based on the further analysis, no results were generated that could be used for comparison purposes.

{¶ 10} Columbus Division of Police Officer Dennis Prestel testified he was part of the SWAT team that arrested Hodson on November 24, 2016.  The police had determined

Hodson's location based on their ability to track his mobile phone. Upon his arrest, Hodson was placed in a police cruiser. They retrieved the phone from Hodson, who said he had "wiped it." (Tr. Vol. II at 380.) Hodson had erased everything on the phone except factory installed software.

{¶ 11} Columbus Division of Police Detective Christopher Cline testified he executed a search warrant at Hodson's house. Hodson was at the home and he denied the allegations, saying "she has been known to lie * * * because she is like me." (Tr. Vol. III at 421.) Hodson told Detective Cline that the allegations were crafted by his in-laws as retribution or for the purpose of removing him from the family. Hodson told Detective Cline that E.H. uses the word "woohoo" to refer to her vagina, and that she learned the word penis from him because she had seen him use the restroom. He also told Detective Cline that E.H. had seen him and H.H. having sex and him watching pornography. During Detective Cline's conversation with Hodson, there were dogs in the house growling at them. Hodson "made a comment to the dogs, It's okay. They are not hurting anybody." (Tr. Vol. III at 423.)

{¶ 12} During the search, police seized multiple electronic devices, which were forensically analyzed to retrieve data. This analysis revealed searches and websites that Detective Cline viewed as relevant to the investigation. Detective Cline testified that these included the website www.xnxx.com/video with a reference to "young_daughter," a pornhub.com video with a reference to "extra small teens," and a website video reference to "painful anal." (Tr. Vol. III at 434.) This search history was retrieved from the iPhone backup on Hodson's computer. On Hodson's laptop, police found electronic searches for "very young girl sexually exploited," "forced anal," and "young girls being sexually exploited xxx video." (Tr. Vol. III at 435.) In all, there were 1,120 URLs associated with pornographic websites, and the searches Detective Cline referred to were done on one day in September 2016. Detective Cline testified that similar searches were run on other dates. Nothing was recovered from Hodson's phone because all of his data had been erased.

{¶ 13} Detective Cline monitored Hodson's jail phone calls, which were primarily with H.H. Several of these recorded calls were played at trial. In one conversation, Hodson and H.H. discussed his wiping of his phone. Hodson stated, "I don't care what they want to think. I mean, they can think I wiped it to keep them from getting anything off of it,

which there wasn't anything on it anyway."  (Tr. Vol. III at 443.)  During that conversation, H.H. stated that "he wiped his phone because I need the money * * * for selling it * * * and that is why you were wiping it so you can sell it."  (Tr. Vol. III at 448.)  Detective Cline testified that Hodson and H.H. were talking about wiping the phone because they were going to sell it.

{¶ 14} In another recorded call, H.H. told Hodson that because she had reported a tablet and phone stolen they would not need to deactivate them.  Hodson discussed with H.H. how to change his password, then he said, "then we don't need to worry about them accessing my options, that's for fucken sure."  (Tr. Vol. III at 451.)  Hodson then added, "And you know what, I don't give a fuck if they say we are tampering with evidence or not." (Tr. Vol. III at 451.)  Detective Cline explained that during the jail calls, Hodson was "instructing her to go through all of his accounts to -- to either close them or to prevent us from looking into them."  (Tr. Vol. III at 454.)

{¶ 15} In another call, Hodson declared how H.H.'s parents had "destroyed" their lives.  (Tr. Vol. III at 458.)  This conversation then followed:

[H.H.]:  That is what they wanted.

Hodson: Well, for what I have to tell you tomorrow, we are going to destroy theirs.

[H.H.]:  Okay.

Hodson:  And you might not like it, you might not want to go along with it, but I'm going to tell you, and if you don't want to go along with it, that's fine.

[H.H.]:  But I will go along with anything at this point.

Hodson: Okay.  Well, when you come to visit me tomorrow, you will know, okay.

* * *

Hodson: * * * some fingers are going to be pointed at your father and you might not like it.

[H.H.]:  I don't care about my dad at this point.  I really don't.

> Hodson:  Well, you are going to be the one pointing the fingers at him.

(Tr. Vol. III at 458-59.)  Detective Cline testified that, in this discussion, Hodson and H.H. were talking about placing blame with grandfather.

{¶ 16}  In a subsequent call, Hodson said, "What I'm going to do involves your dad and you. * * * And there is going to be something that you will need to say that has been going on for years." (Tr. Vol. III at 461.)  H.H. expressed worry that she would be implicated in something.  Hodson stated, "I want to make sure you are going to be up to it because once it starts, you can't back down -- ever back down from it." (Tr. Vol. III at 461.)  Hodson added, "Well, my thing that I want to talk to you about tomorrow will create a significant amount of reasonable doubt * * * [a]nd it will put your father under significant scrutiny." (Tr. Vol. III at 462.)  Detective Cline opined that Hodson and H.H. were "crafting a plan. He is trying to convince [H.H.] of crafting a plan against her father." (Tr. Vol. III at 461-62.)  "[T]hey are crafting a plan of something that happened between [H.H.] and [grandfather] that they want to have come to light to shift the spotlight." (Tr. Vol. III at 462-63.)

{¶ 17}  In another call, Hodson directs H.H. to expressly state that they never had anal sex before.  (Tr. Vol. III at 468.)  H.H. responded by saying, "Yeah, I'm saying that that's the only kind of sex we have was vaginal." (Tr. Vol. III at 468.)  Hodson stated, "Thank you for clarifying that and now it is recorded." (Tr. Vol. III at 469.)

{¶ 18}  During cross-examination, Detective Cline was asked about his opinion that Hodson and H.H. were scheming against grandfather.  Detective Cline answered that, based on this information, he worked during the investigation to eliminate suspects. During re-direct, Detective Cline explained he was able to eliminate grandmother and grandfather as persons who possibly coached E.H. into making the allegations and eliminate grandfather as a suspect.  The state asked him what process he used to eliminate suspects, and he responded, "I used the polygraph." (Tr. Vol. III at 483.)  Defense counsel objected, and the court overruled the objection.

{¶ 19}  Over Hodson's objection, the trial court admitted into evidence all of the medical records from Nationwide Children's Hospital relating to E.H.'s care.  Additionally,

after the state rested, Hodson moved for a mistrial based on the reference to the polygraph test. The trial court denied the request.

{¶ 20} Hodson testified on his own behalf. He admitted to having several prior theft convictions and having had problems with addictions, in particular to crack cocaine and then to opiates. He testified he has had genital herpes since approximately 1987. He further testified he has suffered from erectile dysfunction since December 2015, but he also admitted to still getting erections. He also explained his belief that E.H. had been manipulated into making the allegations against him. As to the specific allegations in this case, he denied having anal sex with E.H., having attempted to insert his fingers into her vagina, and having licked her vagina.

{¶ 21} Based on the evidence at trial, the jury found Hodson guilty of committing three counts of rape, one count of gross sexual imposition, and one count of tampering with evidence, as charged in the indictment. The trial court sentenced Hodson to life in prison without the possibility of parole as to each of the three rape counts, three years in prison as to the gross sexual imposition count, and three years in prison as to the tampering with evidence count, to be served concurrently with each other.

{¶ 22} Hodson timely appeals.

## II. Assignments of Error

{¶ 23} Hodson assigns the following errors for our review:

> [1.] The trial court abused its discretion when it failed to grant Defendant-Appellant's Motion for a Mistrial due to the admission of testimony related to the use of a polygraph test.
>
> [2.] The trial court erred in admitting medical records from Nationwide Children's Hospital that contained inadmissible hearsay.
>
> [3.] The trial court erred in admitting other acts evidence in violation of Evidence Rule 404.
>
> [4.] Defense Counsel's actions and omissions at trial deprived Defendant-Appellant of the ineffective [sic] assistance of counsel.

## III. Discussion

{¶ 24} In his first assignment of error, Hodson contends the trial court abused its discretion in not granting a mistrial based on the admission of testimony regarding the use of a polygraph test.

{¶ 25} An appellate court reviewing a trial court's decision on a motion for mistrial defers to the judgment of the trial court, as it is in the best position to determine whether circumstances warrant a mistrial. *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). Thus, we review a trial court's decision on a motion for mistrial for an abuse of discretion. *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 42 (10th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173, 182 (1987). An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 26} " 'A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected.' " *State v. Walburg*, 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 52, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 33 (2d Dist.1988). Instead, a trial court should only declare a mistrial when "the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). In determining whether a defendant was deprived of a fair trial, we must determine whether, absent the error or irregularity, "the jury would have found the appellant guilty beyond a reasonable doubt." *Aleshire* at ¶ 42, citing *State v. Maurer*, 15 Ohio St.3d 239, 267 (1984).

{¶ 27} "The results of polygraph tests are generally not admissible as evidence for purposes of establishing the guilt or innocence of the accused for the reason that such tests have not attained scientific or judicial acceptance as an accurate and reliable means of ascertaining truth or deception." *State v. Rowe*, 68 Ohio App.3d 595, 609 (10th Dist.1990). The following factors are considered to determine whether the introduction of testimony regarding a polygraph examination is prejudicial: (1) whether defendant objected and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; and (5) whether the results of the test were admitted rather than merely the fact that a test had been conducted. *Id.* at 611. A reviewing court must also

consider the evidence of the appellant's guilt in determining whether any reference to a polygraph was prejudicial to the appellant. *State v. Rojas*, 10th Dist. No. 11AP-683, 2012-Ohio-1967, ¶ 17.

{¶ 28} Here, the state asked Detective Cline what process he used to eliminate suspects, and he responded, "I used the polygraph." Defense counsel objected, and the court overruled the objection. While defense counsel immediately objected to the reference to the use of a polygraph, he did not request a cautionary instruction. This reference arguably was not inadvertent because the state specifically questioned the detective regarding the method used in the investigation of other possible suspects. However, the state elicited this testimony after defense counsel had questioned the detective's conduct early in the investigation when Hodson had placed blame on grandfather for allegedly coaching E.H. into making the allegations. The reference was not repeated during any other testimony, and the state made no reference to it during closing argument. Further, the detective provided no testimony regarding the results of the polygraph. He simply indicated the polygraph was used to eliminate suspects.

{¶ 29} Additionally, the evidence of Hodson's guilt was overwhelming. Both of E.H.'s grandparents testified that she spontaneously stated to them that "daddy puts his penis in my butt and it hurts." She elaborated regarding Hodson's conduct during her forensic interview at Nationwide Children's Hospital. She stated he pulled her pants down and "play[ed] with her butt," she could see Hodson put his penis in her butt, he inserted his fingers in her "woohoo," and licked her "woohoo," which she identified as her vagina. The forensic interviewer described E.H.'s disclosure as "a strong disclosure for a four year old." Other evidence corroborated the credibility of E.H.'s allegations. The vaginal swabs, anal swabs, perianal swabs, and bilateral thigh swabs that were collected from E.H. during her exam revealed the presence of male DNA. While there was no physical evidence of abuse found during the examination of E.H.'s body, testimony at trial indicated that victims of sexual assault commonly show no signs of physical harm. E.H. had stated during the interview before her medical exam that she liked it and laughed when Hodson had licked her vagina. Consistent with these statements, E.H. indicated to her medical examiner that she liked being touched during the vaginal swabbing. The examiner had never had a child tell her this before. E.H. also stated during the forensic interview that her dog had growled

when Hodson had sexually assaulted her, but that Hodson had placated the dog by saying he was not hurting her. The detective testified that, during the execution of the search warrant, Hodson's dogs were growling, and that Hodson had assured the dogs that no one was being hurt. Thus, E.H.'s statements to the forensic examiner regarding the instances of rape were detailed, demonstrated her awareness of anatomy, and were consistent with other evidence presented at trial.

{¶ 30} Other evidence incriminated Hodson. An examination of Hodson's electronics revealed pornographic searches related to the abuse and exploitation of young girls, and they were contemporaneous to the allegations in this case. These searches included "very young girl sexually exploited" and "forced anal." Hodson's jail calls with H.H. showed that he was scheming to place blame on grandfather for the situation, namely, to fabricate a story that, in his view, would create reasonable doubt as to his guilt. Furthermore, Hodson wiped clean his phone shortly before he was arrested, and he attempted to guide H.H. through tampering with other electronically stored information.

{¶ 31} In testifying on his own behalf, Hodson attempted to place blame with grandfather and grandmother, under the theory that they never liked him and were trying to remove him from the family by manipulating E.H. However, his theory that E.H.'s grandparents had coached her into making the allegations was not otherwise supported by anything other than his accusation. Conversely, as detailed above, E.H.'s strong disclosure, and the other evidence that corroborated her allegations, overwhelmingly belied his denials.

{¶ 32} In sum, the evidence of Hodson's guilt was overwhelming, and any error in the admission of the passing reference to the use of a polygraph to eliminate suspects was not prejudicial.

{¶ 33} For these reasons, we overrule Hodson's first assignment of error.

{¶ 34} Hodson's second assignment of error alleges the trial court erred in admitting medical records from Nationwide Children's Hospital that contained inadmissible hearsay. He argues that statements in the medical record that were not made by the patient for the purpose of medical diagnosis or treatment should not have been admitted into evidence.

{¶ 35} Generally, the decision to admit or exclude relevant evidence rests within the sound discretion of the trial court. *State v. Angus*, 10th Dist. No. 05AP-1054, 2006-Ohio-

4455, ¶ 16, citing *Sage* at paragraph two of the syllabus. Absent a clear showing that the court abused its discretion in a manner that materially prejudices a party, a reviewing court will not disturb a ruling on the admission of evidence. *State v. Phelps*, 10th Dist. No. 14AP-4, 2015-Ohio-539, ¶ 27; *State v. Issa*, 93 Ohio St.3d 49, 64 (2001).

{¶ 36} Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible unless it falls within one of the exceptions to the rule against hearsay. *State v. Clay*, 187 Ohio App.3d 633, 2010-Ohio-2720, ¶ 27 (5th Dist.), citing Evid.R. 802, 803-04. Pursuant to Evid.R. 803(4), "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are excepted from the hearsay rule. This exception is not necessarily limited to statements of the patient herself. *See State v. Nasser*, 10th Dist. No. 02AP-1112, 2003-Ohio-5947, ¶ 54 ("[S]tatements by others, most often close family members, may be received if the relationship or the circumstances give appropriate assurances."). "The test for admissibility is whether the subject matter of the statements is reasonably pertinent to diagnosis or treatment." *Id.* at ¶ 55.

{¶ 37} Here, the trial court admitted the Nationwide Children's Hospital medical records over Hodson's objection. On appeal, Hodson argues these records contain inadmissible hearsay because they contained statements not made by the patient for the purpose of medical diagnosis or treatment. We are not persuaded. First, we disagree with Hodson's general assertion that simply because there are statements made by persons other than the patient contained in the medical records, those statements were inadmissible. *Nasser*. Second, Hodson does not specifically identify the allegedly inadmissible hearsay statements contained in the admitted medical records, other than referencing, in the statement of the facts section of his appellate brief, statements in the medical records from grandfather and grandmother indicating that Hodson has genital herpes. Given the allegations, E.H.'s grandparents relayed this reasonably pertinent information to the medical team that examined E.H. Further, Hodson, in his own testimony, confirmed that he has genital herpes. Thus, even if these statements were not for the purpose of E.H.'s

diagnosis or treatment, there was no prejudice as this evidence was cumulative to Hodson's own testimony.   And, as discussed above, the evidence of Hodson's guilt was otherwise overwhelming.

{¶ 38} Therefore, Hodson's second assignment of error is overruled.

{¶ 39} In his third assignment of error, Hodson asserts the trial court erred in admitting other acts evidence in violation of Evid.R. 404.  He argues he was prejudiced by his sister's testimony regarding his residence outside the family home in his youth.

{¶ 40} Evid.R. 404(B) states "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Evid.R. 404(B).  "[O]ther acts" evidence under Evid.R. 404(B) " 'may be admissible so long as the evidence is admitted for any proper purpose other than proving the defendant's propensity to act [in] conformity with a particular trait of his character.' " *State v. Fowler*, 10th Dist. No. 15AP-1111, 2017-Ohio-438, ¶ 21, quoting *State v. Rocker*, 10th Dist. No. 97APA10-1341 (Sept. 1, 1998).  These listed exceptions are not exclusive. *Rocker*, citing *State v. Smith*, 49 Ohio St.3d 137, 140 (1990).

{¶ 41}  Here, Hodson's sister testified Hodson left the family home when she was 13 years old and he was 16 years old.  She testified Hodson was "sent to live at a home for teenagers who were violent and couldn't stay at home or at school anymore and so he lived there for the next couple of years."  Hodson argues this testimony was offered to show that he is violent and dangerous and acted consistent with that character trait in harming E.H. He asserts his sister's testimony was not pertinent to E.H.'s allegations or any current circumstance involving him or E.H.  We are unpersuaded.

{¶ 42} The state made no attempt to use the evidence of Hodson's conduct in his youth to prove he committed the alleged crimes in this case. Hodson's sister's non-specific reference to Hodson residing with other violent teenagers during their youth was consistent with other testimony explaining why grandmother, grandfather, and Hodson's sister delayed their reporting the sexual assault allegations for a few days.  These witnesses explained at trial that Hodson has anger issues, and, therefore, they had safety concerns about immediately reporting the sexual assault allegations.  They knew Hodson had one or

more guns, and they were concerned that he could become violent over the accusations. Consequently, they developed a reporting plan based on those concerns. Because Hodson's sister's testimony regarding Hodson leaving the family home in his youth to reside with other violent teenagers was admissible to help explain the delay in reporting the sexual assault allegations, we find the trial court did not abuse its discretion in not excluding this testimony. Moreover, even if this challenged testimony should have been excluded as inadmissible other acts evidence, its admission was not prejudicial because, as discussed above, the evidence of Hodson's guilt in committing the sexual assault crimes was otherwise overwhelming.

{¶ 43} Accordingly, we overrule Hodson's third assignment of error.

{¶ 44} Hodson's fourth assignment of error asserts he was deprived of effective assistance of trial counsel. In order to prevail on a claim of ineffective assistance of counsel, Hodson must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This first prong requires Hodson to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If Hodson can so demonstrate, he must then establish he was prejudiced by the deficient performance. *Id.* To show prejudice, Hodson must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694. In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101.

{¶ 45} Hodson contends his trial counsel was ineffective by not objecting to various testimony at trial. In particular, he asserts trial counsel should have objected to Ball's reference to a study conducted by Nationwide Children's Hospital's child advocacy center concerning patients seen for sexual assault, Detective Cline's hearsay testimony identifying him as E.H.'s assaulter, Detective Cline's testimony regarding the contents of the recorded jail calls between Hodson and H.H., and references to him owning weapons, his violent nature, and his temperamental outbursts.

{¶ 46} The failure to object to error alone ordinarily is not enough to sustain a claim of ineffective assistance of counsel. *State v. Stanford*, 10th Dist. No. 16AP-873, 2018-Ohio-3961, ¶ 27, citing *State v. Holloway*, 38 Ohio St.3d 239 (1988). Trial strategy and even debatable trial tactics do not establish ineffective assistance of counsel. *Conway* at ¶ 101. A reviewing court must be "highly deferential to counsel's performance and will not second-guess trial strategy decisions." *State v. Tibbetts*, 92 Ohio St.3d 146, 166-67 (2001). In evaluating a claim of ineffective assistance of counsel based on counsel's failure to file a motion or make an objection, we consider whether such an objection would have been meritorious. *State v. Cashin*, 10th Dist. No. 09AP-367, 2009-Ohio-6419, ¶ 12.

{¶ 47} Here, Hodson fails to show his trial counsel was deficient. He contends his counsel should have objected on relevance grounds to the testimony regarding his ownership of weapons, his allegedly violent nature, and his temperamental outbursts. However, this testimony was relevant. Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Multiple witnesses testified that Hodson's gun ownership and anger issues were critical factors in their deciding to wait to report the sexual assault allegations. This testimony was relevant to their credibility. Because this testimony was relevant, trial counsel was not deficient in not objecting to it on that basis.

{¶ 48} Hodson argues his trial counsel should have objected to Detective Cline's testimony regarding E.H.'s statements during the forensic interview at the hospital and to the detective's testimony describing the substance of the recorded jail phone calls between Hodson and H.H. As to E.H.'s statements during the forensic interview, those recorded statements were played for the jury, and Detective Cline reiterated those statements not for the truth of the matter asserted, but to help explain the course of his investigation and the collection of physical evidence. Further, Detective Cline relaying that E.H. identified Hodson as her assaulter during that interview with the forensic examiner was cumulative to the actual playing of that recorded conversation. We also reject Hodson's assertion that Detective Cline's observations were speculative as to the meaning of the recorded jail calls. Pursuant to Evid.R. 701, opinion testimony by a lay witness is admissible regarding those opinions or inferences which are "(1) rationally based on the perception of the witness and

(2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  Detective Cline's observations regarding the jail calls were based on his perception of the contents of those calls.  Significantly, the calls that Detective Cline discussed were played for members of the jury, permitting them to evaluate his observations in relation to their own review of those calls.  And his testimony regarding the content of those calls did not reveal any insight that could not be reasonably understood from a careful review of the statements in those calls.  Thus, we cannot find that Hodson's trial counsel was deficient in not objecting to Detective Cline's testimony as to the phone calls.

{¶ 49} Lastly, Hodson contends his trial counsel should have objected to Ball's statements regarding the infrequency that physical trauma is found with sexual assault victims.  According to Hodson, Ball, who examined E.H. at the hospital, should not have been permitted to testify regarding a study conducted by Nationwide Children's Hospital's child advocacy center.  Ball, an expert in child sexual assault exams, testified regarding the physiology of why physical recovery from a sexual assault is usually relatively quick, and then noted that "much of our sexual abuse cases will have normal findings or normal exams but it doesn't negate the sexual abuse happening, doesn't mean it didn't happen." (Tr. Vol. II at 292.)  She testified that of the 124 exams she had performed on sexual assault victims, less than 10 had visible physical injuries.  She also generally referred to a study at the child advocacy center that tracked the number of normal findings out of all exams.  It was determined that more than 90 percent of the exams handled by the center are normal.  Hodson asserts his counsel should have challenged Ball's reference to the child advocacy center's study.  However, the statistics reflected in the center's study were consistent with Ball's own experience as an expert child sexual assault examiner for the center.  Ball's tangential reference to this study was not improper opinion testimony. *See State v. Lee*, 10th Dist. No. 02AP-1340, 2003-Ohio-4059, ¶ 43 (expert's testimony regarding genital trauma in sexual assault cases was not improperly based on a statistical study from a source other than the expert's own personal knowledge when reference to that study was tangential to expert's own personal experience as to the issue).  Thus, Hodson's trial counsel was not deficient in not objecting to this additional evidence.

{¶ 50} Hodson asserts that, even if his trial counsel was not ineffective as to particular failures to object, the cumulative effect of his omissions constituted ineffective assistance of counsel. We are unpersuaded. Hodson cannot establish he is entitled to relief under this doctrine simply by combining his unsuccessful claims together. *See State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 134 (rejecting claim that cumulative effect of counsel's errors and omissions constituted ineffective assistance of counsel where court rejected each of the appellant's individual claims of ineffective assistance); *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 173 ("[B]ecause none of [the appellant's] individual claims of ineffective assistance has merit, he cannot establish an entitlement to relief simply by joining those claims together.").

{¶ 51} For these reasons, we overrule Hodson's fourth assignment of error.

## IV. Disposition

{¶ 52} Having overruled all four of Hodson's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and BRUNNER, JJ., concur.